GREENBERG, Circuit Judge,
dissenting.
Notwithstanding the majority’s thoughtful and well-crafted opinion, I respectfully dissent as I would reverse the District Court’s order that it entered following its opinion reported at ZF Meritor LLC v. Eaton Corp., 769 F.Supp.2d 684 (D.Del. 2011), denying Eaton’s motion for judgment as a matter of law. Although the majority opinion recites in detail the factual background of this case, I nevertheless also set forth its factual predicate as I believe the inclusion of certain additional facts demonstrates even more clearly than the facts the majority sets forth why Eaton was entitled to judgment as a matter of law.[1]
*304 I. FACTS
A. The [¶] Transmission Market
The parties stipulated before the District Court and do not now dispute that the relevant product market in this case is heavy-duty (“HD”) truck transmissions and that the relevant geographic market is the United States, Canada, and Mexico, the so-called “NAFTA market.” On appeal, Eaton does not dispute that it possessed monopoly power in that market during the events relevant to this case.
[¶] trucks include linehaul trucks, the familiar 18-wheelers used to travel long distances on highways, and performance trucks used on unfinished terrain or to carry heavy loads, such as cement mixers, garbage trucks, and dump trucks. There are three types of [¶] truck transmissions: manual, automatic, and automated mechanical.
As the majority indicates, the NAFTA [¶] truck transmission market functions in the following way. Original Equipment Manufacturers (“OEMs”) construct [¶] trucks. There were four OEMs during the period relevant to this dispute: Freightliner Trucks (“Freightliner”); International Truck and Engine Corporation (“International”); PACCAR; and Volvo Group (“Volvo”). OEMs provide the purchasers of [¶] trucks with “data books” that list [¶] truck component part options, including transmissions, and thereby allow the customer to select from various options for certain parts of the [¶] trucks.
The data books list one option as the “standard” offering with which OEMs will fit the truck unless the customer selects otherwise. Additionally, the component part listed in the data book as the lowest-priced option is referred to as the so-called “preferred” or “preferentially-priced” option.[2] For obvious reasons, positioning as the standard or preferred component part option in a data book can be beneficial and a form of promotion of the parts that the component part manufacturers supply. Evidence adduced at trial, which I explore further below, shows that OEMs decide which component parts to list as standard or preferred based, at least in part, on their determination of which component part is the most advantageous option for them to supply in terms of such factors as cost of supply pricing as to the OEMs and the availability and performance of the product. Consequently, the OEMs and component part manufacturers negotiate with respect to data book positioning.
Data books, however, are not the exclusive means of advertising [¶] truck transmissions or other parts nor do they restrict the truck purchasers’ choices. Component suppliers, such as appellees[3] and Eaton, market directly to purchasers, and purchasers of [¶] trucks can and do request unpublished options that are not listed in the data books.
B. The Parties and Market Conditions
During the 1950s, Eaton began manufacturing transmissions for [¶] trucks, and eventually it developed a full product line of transmissions in a range of speeds and styles. Prior to 1989, Eaton was the only *305 domestic manufacturer of [¶] truck transmissions. In 1989, however, Meritor entered the market with 9- and 10-speed [¶] manual transmissions for linehaul trucks. But, unlike Eaton, Meritor did not offer nor did it develop at any point a full product line of [¶] truck transmissions. Nevertheless, by 1999 Meritor had obtained approximately 18% of the market for sales of [¶] truck transmissions in North America.
In 1999, Meritor entered into a joint venture with ZF Friedrichshafen (“ZF AG”), a large German company that previously had not sold [¶] truck transmissions in North America. The joint venture, called ZF Meritor (“ZFM”), sought to adapt for the NAFTA market ZF AG’s “ASTronic” transmission, a linehaul 12-speed, 2-pedal, automated mechanical transmission. Meritor transferred its transmission business to ZFM, and ZFM introduced the ASTronic (renamed the “FreedomLine” for the NAFTA market) to these new markets around February 2001. At that time, Eaton did not have a two-pedal automated mechanical transmission and did not intend to release one until 2004. Appellees believe that the FreedomLine was technically superior to other [¶] truck transmissions available.
In late 1999, during the same time period that appellees formed ZFM, there was a severe economic downturn in the NAFTA market area that caused a sharp decline of [¶] truck orders. By 2001, around the time ZFM introduced the FreedomLine, [¶] truck orders had fallen by approximately 50%, with demand plummeting from more than 800,000 new [¶] truck orders per year to roughly 150,000 orders.
C. The Long-Term Agreements
In the 1980s and 1990s, Eaton entered into supply agreements with each of the four OEMs. These agreements set the prices for Eaton’s transmissions and offered volume discounts to the OEMs, i.e., discounted prices based on the OEMs’ purchase of a certain quantity of transmissions. Appellees do not allege that these agreements violated the antitrust laws. Beginning in late 2000, however, Eaton entered into new supply agreements with all four of the OEMs. Those agreements, to which the parties refer as long-term agreements (“LTAs”), are at the core of the present dispute.
Eaton’s LTAs offered the OEMs rebates based on market-share targets. The discounts thus provided the OEMs with lower prices on Eaton’s transmissions conditioned on their purchase of a certain percentage of their transmission needs from Eaton. Although the LTAs’ terms varied, all of the LTAs at issue were consistent in two respects.
First, the LTAs were not explicitly exclusive-dealing contracts: each OEM remained free to buy parts from any other [¶] transmission manufacturer, including ZFM, and none of the LTAs conditioned Eaton’s payment of rebates on an OEM’s purchase of 100% of its transmission needs from it. Second, each LTA contained a so-called “competitiveness clause” that permitted the OEM to exclude an Eaton product from the share target and to terminate its LTA altogether if another manufacturer offered transmissions of better quality or lower price. Because the LTAs are at the crux of ZFM’s claims, I review those four contracts and the circumstances of their formation in some detail.
1. Freightliner
As of 1998, both Eaton and Meritor had respective three-year supply agreements with Freightliner, the largest of the OEMs. Meritor’s agreement provided that it would reduce the price of its component *306 parts if Freightliner listed Meritor’s parts as standard in its data book, while, as I have mentioned, Eaton’s agreement provided volume-discount rebates to Freight-liner.
In October 2000, Freightliner notified Meritor, which by then had evolved into ZFM with respect to its transmission business, that Eaton had offered it 10-speed transmissions at a price significantly lower than Meritor’s price, Eaton was offering certain transmissions that Meritor did not have available, and Eaton’s transmissions were superior to Meritor’s in price and technology. Pursuant to a provision in Meritor’s supply agreement that required Meritor to remain competitive with respect to its products in terms of quality and technology, Freightliner notified Meritor that it had 90 days within which to match Eaton’s inventory or Freightliner would delete Meritor’s noncompetitive products from the agreement. Though Meritor disputed Freightliner’s contention it did not make a counteroffer or offer to match Eaton’s inventory.
Soon thereafter, in November 2000, Eaton entered into a five-year LTA with Freightliner, one of the four contracts that appellees challenge. The LTA provided rebates ranging from $200 to $700, contingent on a 92% share target for Eaton’s transmissions and clutches, an additional truck component that Eaton manufactured. In 2003, Eaton and Freightliner amended the LTA by adopting a sliding scale that entitled Freightliner to varying lower rebates if it met lower market-share targets beginning at 86.5% and going up to 90.5%.
In exchange for the discounted prices, the LTA required Freightliner to list Eaton’s transmissions as the “preferred” option in its data book. Significantly, however, Freightliner “reserve[d] the right to publish” the FreedomLine transmission “through the life of the agreement at normal retail price levels.” J.A. at 1948. The LTA also provided that in 2002 Freightliner would publish Eaton’s transmissions and clutches in its data book exclusively, but the parties amended that provision in 2001 to allow Freightliner to continue to publish Eaton’s competitors’ products. From 2002 onwards, Freightliner did not list ZFM’s manual transmissions but it continued to list ZFM’s other transmissions from 2000 to 2004. In 2004, however, Freightliner removed the FreedomLine from its data books because Meritor[4] had refused to pay a $1,250 rebate it had promised to Freightliner on that product and because Freightliner had experienced reliability issues with ZFM’s products. See id. at 3725 (letter from Freightliner representative to Meritor representative (Feb. 10, 2004)) (“Freightliner is outraged at ArvinMeritor in the handling of the FreedomLine transmissions price changes. It is totally unacceptable that ArvinMeritor would commit to price protection, and then seek to renege on that commitment.”).
Under the LTA, Eaton had the right to terminate the agreement if Freightliner did not meet its share targets. In 2002, however, even though Freightliner did not meet the 92% share target, Eaton did not terminate the agreement. In 2003, the parties amended the LTA so that it would last for a total of ten years, extending the agreement to 2010.
2. International
Eaton entered into a five-year LTA with International in July 2000. A representative from International stated that International entered into the LTA because it *307 made “good business sense,” id. at 1532, inasmuch as the LTA provided the lowest purchase price for International and there was “greater customer preference and brand recognition for the Eaton product,” id. at 1528.
In return, Eaton provided a $2.5 million payment to International, $1 million of which was payable in cash or in cost-savings initiatives. The LTA provided sliding scale rebates of 0.35% to 2% beginning at a market share of 80% and up to 97.5% and above. It also provided for sliding rebates based on a market share of Eaton’s clutches. For current truck models, International agreed to list Eaton’s transmission as the preferred option, and for future models, it agreed to publish Eaton’s transmissions exclusively.[5] Notwithstanding the latter provision, International continued to list ZFM’s manual transmissions in its printed data book.
3. PACCAR
In July 2000, Eaton entered into a seven-year LTA with PACCAR. A PACCAR representative stated that PACCAR agreed to the market-share rebates because it “ma[d]e long term economic sense and it ha[d] a total value as to PACCAR.” Id. at 1555. The PACCAR representative indicated that the “total value” concept incorporated such considerations as the “lower cost” provided by the LTAs, “providing a full product line of ... transmissions,” “providing product during periods of peak demand and ensuring the product is available,” “warranty provisions,” and “aftermarket supply.” Id. at 1555-56.
The representative indicated that PAC-CAR was in discussions with ZFM regarding a supply agreement but ultimately it declined to enter into an agreement with ZFM because, apart from Eaton’s more appealing offer, ZFM suffered from negative considerations such as ZFM’s restricted output of its products, “massive transmission failure in the marketplace that caused market unacceptance of their transmissions earlier,” and ZFM’s lack of a full product line. Id. at 1557, 1562. Additionally, PACCAR “always [paid] ... a higher cost [for a ZFM product] than a comparable Eaton product, independent of the rebate,” particularly for the FreedomLine, which, according to the PACCAR representative, was “by design, a more expensive product” because of its European origins. Id. at 1558-59. In this regard, the representative stated that Eaton’s rebates were not “the only thing that made them competitive.” Id. at 1562.
Under the LTA, Eaton provided price reductions, a $1 million payment, firm pricing for seven years, and engineering and marketing support. PACCAR also could obtain rebates ranging from 2% to 3% in exchange for meeting 90% to 95% market share targets in both transmissions and clutches. In exchange, PACCAR was required to list Eaton as the standard and preferred option in its data book. At all times PACCAR continued to list ZFM’s transmissions in its data book.
4. Volvo
Eaton entered into a five-year LTA with Volvo in October 2002. A Volvo representative stated that Volvo entered into the LTA because it represented “the best overall value for Volvo” in terms of “price, delivery, quality manufacturing, and logistics.” Id. at 1430. Indeed, another Volvo representative stated that “[p]ricing was significantly better with Eaton [even] ex- *308 eluding rebates.” Id. at 1295; see id. at 1293, 1296 (the same representative estimating the savings to Volvo from the LTA with Eaton to be about 12% to 15% excluding the rebates and stating that Volvo’s motiyation in entering the LTA was “purely dollars, dollars and cents”). Volvo was in discussions with ZFM to sign a supply agreement, but ultimately it did not do so in large part because of ZFM’s “inability to have a complete product offering of all transmissions.” Id. at 1431.
The LTA provided sliding scale rebates of 0.5% to 1.5% originally set at 65% market share, and, as of-2004, a 70% to 78% market share. • Eaton had the option of terminating the LTA if its market share at Volvo fell below 68%. In turn, Volvo agreed to position Eaton’s transmissions and clutches as the standard and preferred offering. Volvo continued to list in its data books both ZFM’s and Volvo’s own transmissions that it manufactured only for installation in its own trucks.[6]
D. ZFM’s Business and Exit from the Market
As of July 2000, before Eaton signed any of the challenged LTAs, ZFM had lost nearly 20% of its market share in transmissions, its share declining from 16.1% to 13%. Minutes from a ZFM Board of Directors meeting held in July 2000 reveal that ZFM’s President, Richard Martello, identified a number of factors that caused ZFM’s falling market position, including:
(i) poor product quality image, (ii) a decrease in Ryder business, (iii) turnover in the [e]ompany’s sales organization, (iv) an increase in sales of Eaton Auto-shift, (v) the push towards 13-speed transmissions, especially by Freightliner, (vi) the multi-year fleet business lost due to competitive equalization cutbacks in early 1999 and (vii) controlled distribution.
J.A. at 3235.
Some explanation will illuminate Mr. Martello’s observations. “Competitive equalization” payments are incentives a component manufacturer provides directly to truck purchasers for them to select its products from a data book. ZFM’s internal documents, included in the trial record, demonstrate that “[d]uring the peak periods of production between March 1999 and September 1999, Meritor reduced [competitive equalization] payment[s] on deals trying to reduce the incentive [to] ‘war’ with Eaton” but Eaton “continued ... to buy business when Meritor declined deals.” Id. at 3028. “Controlled distribution” refers to the practice of purposefully limiting the quantity of a product available to the market — a practice that ZFM identified as the cause of it losing “various deals” due to ZFM’s “lack of product” availability. Id. at 3030. The reference to ZFM’s decrease in “Ryder business” appears to refer to the fact that ZFM lost the business of the OEM previously known as Mack-Ryder due to ZFM’s controlled distribution practices. See id.
In that same meeting, Mr. Martello also observed that there were “significant forces in favor of direct drive, fully automated transmissions,” including:
(i) major engine changes in October 2002 due to emissions standards changes, (ii) continued driver shortages, (iii) continued upward pressure on fuel prices, (iv) market pressure on ‘guaranteed cost of operation’ sales incentives and (v) continued technician shortages.
*309 Id. at 3236. Significantly, as I already have noted, the FreedomLine was an automated mechanical transmission, not a fully automated transmission.
Mr. Martello also noted that the industry was turning away from the component part manufacturers’ traditional focus on advertising directly to truck purchasers as an incentive for them to select their component part, so-called “pull” advertising, to focus instead on “the creation of closer relationships with the OEMs.” Id. Along this line, Mr. Martello observed that the OEMs desired to have “single source, full product line suppliers” in an effort to reduce costs. See id. Additionally, Mr. Martello noted that OEMs were resistant to the prospect of engineering new products, such as the FreedomLine, into their trucks, and that, as sales of [¶] trucks declined, component part manufacturers provided rapidly increasing sales incentives to the OEMs. See id. To overcome these obstacles and increase ZFM’s market share, Mr. Martello “recommended that a full line of automated products be released at every OEM and that [ZFM] develop a full [HD] product line.” Id. at 3237.
Notwithstanding ZFM’s awareness of the declining [¶] truck market, after the 2000 meeting ZFM refused to lower its prices despite certain OEMs’ repeated requests that it do so. See, e.g., id. at 3596 (letter from Chris Benner, ZFM, to Paul D. Barkus, International (Sept. 19, 2002)) (stating ZFM’s refusal to lower prices despite International’s June 2002 request that it do so); id. at 1537-38 (deposition testimony of Paul D. Barkus, International) (indicating that ZFM refused International’s request that ZFM lower its prices in December 2001); id. at 3953 (ZFM Board minutes) (“Board did not agree with providing any price decreases to Volvo/Mack.”). To the contrary, at the end of 2003, ZFM raised the price of the FreedomLine by roughly 25%, an increase that caused significant consternation among the OEMs. Moreover, ZFM did not develop a full [¶] truck transmission product line as Mr. Martello had recommended. Furthermore, as the majority notes, at least two of ZFM’s transmissions, including its flagship transmission, the FreedomLine, experienced significant performance problems resulting in frequent repairs, and, in 2002 and 2003, ZFM faced significant warranty claims on its products amounting to millions of dollars in potential liability.
Notwithstanding the trouble it experienced in 2000, ZFM experienced growth in some areas. From 2001 to 2003, the FreedomLine transmission went from comprising 0% of the linehaul market to 6% of the linehaul market, and between 2000 and 2003, ZFM’s market share of linehaul [¶] truck transmissions increased at three of the four OEMs. From July 2000 to October 2003, ZFM’s share of the total [¶] transmission market ranged between 8% and 14%.
In spite of its gains, ZFM believed that Eaton’s LTAs limited ZFM’s potential market share to approximately 8% of the transmission market, not the 30% that it had expected to gain as a result of the joint venture and which it needed to achieve for the venture to be a viable business. In December 2003, on the basis of that calculation, ZFM was dissolved. Following ZFM’s dissolution, Meritor returned to the transmission business it had conducted before entering into the joint venture. In 2006, however, Meritor exited the [¶] truck transmission business entirely.
E. Eaton’s Pricing
At trial, appellees did not allege or introduce any evidence that Eaton priced its transmissions below any measure of cost *310 during the relevant time period, and, on appeal, appellees do not contend that Eaton’s prices were below cost. Furthermore, at all times relevant to the present dispute, Eaton’s average transmission prices to the OEMs were lower than ZFM’s average prices to the OEMs. In other words, the OEMs paid more to purchase and supply ZFM’s transmissions to the truck purchasers than they paid for Eaton’s transmissions. In particular, ZFM priced its FreedomLine significantly above the price of Eaton’s transmissions.
II. ANALYSIS
Although it frames the question differently, as the majority recognizes the central question that emerges in this appeal is what effect, if any, does appellees’ failure to allege, much less prove, that Eaton engaged in below-cost pricing have on its claims? Eaton, of course, contends that the effect is dispositive, arguing that Supreme Court precedent requires that courts apply the price-cost test of Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993), in any case in which a plaintiff challenges a defendant’s pricing practices.[7] Appellees challenged Eaton’s pricing practices, namely, its market-share discounts, but because appellees did not introduce evidence that Eaton engaged in below-cost pricing, Eaton contends that appellees did not establish that they suffered antitrust injury nor did they show that by adopting the LTAs Eaton violated the antitrust laws.[8]
*311 Appellees, of course, contend that their failure to show that Eaton engaged in below-cost pricing is entirely irrelevant to the success or failure of their claims. Appellees claim that the obligation to show below-cost pricing applies only where a plaintiff brings a so-called “predatory pricing” claim.[9] In this regard, appellees contend that they were not required to show that Eaton engaged in below-cost pricing because they did not bring a “predatory pricing” claim. In fact, appellees explicitly disavow any allegation that Eaton engaged in below-cost pricing and instead contend that the LTAs, including the market-share rebates they contained, amounted to unlawful de facto exclusive dealing agreements.[10]
The majority appears to split the difference between the parties’ two positions. The majority concludes that the Brooke Group price-cost test may be dispositive in a case where a plaintiff brings a claim challenging a defendant’s pricing practices [11] and alleges that price itself functioned as the exclusionary tool. I agree completely with the majority’s conclusion in this regard. Thereafter, however, our paths diverge because the majority appears to conclude that where a plaintiff brings a claim of unlawful exclusive dealing against a defendant’s pricing practices but does not contend that the defendant’s prices operated as the exclusionary tool, the price-cost test is irrelevant and has neither dispositive nor persuasive effect.[12]
As I explain further below, while I do not believe that the Supreme Court has held that the inferior courts must impose and give dispositive effect to the Brooke Group price-cost test in every claim challenging a defendant’s pricing practices, the Court’s unwavering adherence to the general principle that above-cost pricing practices are not anticompetitive and its justifications for that position lead me to conclude that this principle is a cornerstone of antitrust jurisprudence that applies regardless of whether the plaintiff focuses its claim on the price or non-price aspects of the defendant’s pricing program. Thus, although the price-cost test may not bar a claim of exclusive dealing challenging a defendant’s above-cost pric *312 ing practices, regardless of how a plaintiff casts its claim or the non-price elements of the pricing practices that the plaintiff identifies as the exclusionary conduct, where a plaintiff attacks a defendant’s pricing practices — and to be clear that is what the market-share rebate programs at issue here are — the fact that defendant’s prices were above-cost must be a high barrier to the plaintiffs success. Accordingly, I believe that we must apply the Brooke Group price-cost test to the present case and give that test persuasive effect in the context of our broader analysis under the antitrust laws at issue.
Allowing appellees that opportunity, the majority concludes that the plaintiffs adduced sufficient evidence at trial from which a jury reasonably could infer that the LTAs represented unlawful “de facto partial exclusive dealing.”[13] In doing so, the majority concludes that despite the fact that the LTAs by their terms were not exclusive nor mandatory and despite the fact that the prices offered under them were at all times above-cost such that an equally-efficient competitor could have matched them, they were de facto partial exclusive dealing contracts because Eaton was a dominant supplier, the OEMs could not have afforded to lose Eaton as a supplier, and thus, the majority reasons, the OEMs were compelled to enter the LTAs and meet their market-share targets. The majority reaches its conclusion despite the absence of evidence in the record suggesting that Eaton would have refused to supply transmissions to the OEMs had the OEMs failed to meet the LTAs’ market-share targets or that Eaton at any point coerced the OEMs into entering the LTAs or meeting the targets. For reasons I set forth more fully below, I cannot join my colleagues in this judicial reworking of the LTAs and the unbridled speculation the majority’s reasoning requires to convert the LTAs into exclusive dealing contracts. Even analyzing appellees’ claims under the rule of reason and the principles used to ascertain whether an exclusive-dealing arrangement is lawful and employing the deferential standard of review to which we subject jury verdicts, it is plain that the agreements could not have been and in fact were not anticompetitive.
A. The Supreme Court’s Treatment of Antitrust Challenges to Pricing Practices
Beginning with Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986), the Supreme *313 Court in a series of cases considering antitrust challenges to pricing practices has made clear that as a general matter above-cost pricing practices do not threaten competition. In Cargill, the Court considered whether Monfort, a beef-packing business, had shown antitrust injury to the end that it had standing to challenge the merger of two of its competitors that allegedly violated Section 7 of the “Clayton Act. See id. at 106-09, 107 S.Ct. at 487-88. Monfort presented two theories of antitrust injury: “(1) a threat of a loss of profits stemming from the possibility that ... [defendant], after the merger, would lower its prices to a level at or only slightly above its costs” and “(2) a threat of being driven out of business by the possibility that ... [defendant], after the merger, would lower its prices to a level below its costs.” Id. at 114, 107 S.Ct. at 491.
The Court rejected Monfort’s first theory of injury, stating “the antitrust laws do not require the courts to protect small businesses from the loss of profits due to continued competition, but only against the loss of profits from practices forbidden by the antitrust laws.” Id. at 116, 107 S.Ct. at 492. Because the defendant’s above-cost “competition for increased market share” was not “activity forbidden by the antitrust laws” but rather constituted “vigorous competition,” Monfort could not demonstrate antitrust injury under its first theory. Id. In this regard, the Court noted that “[t]o hold that the antitrust laws protect competitors from the loss of profits due to such price competition would, in effect, render illegal any decision by a firm to cut prices in order to increase market share.” Id. The antitrust laws, the Court noted, “require no such perverse result” because “[i]t is in the interest of competition to permit dominant firms to engage in vigorous competition, including price competition.” Id. (internal quotation marks and citation omitted). The Court rejected Monfort’s second claim that the defendant would engage in below-cost, i.e. predatory pricing, following the merger because Monfort had failed to raise and failed to adduce adequate proof of that claim before the district court. See id. at 118-19, 107 S.Ct. at 494.
Four years later, in Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990), the Court reiterated that above-cost pricing practices generally are not anticompetitive, this time in the context of Section 1 of the Sherman Act. In Atlantic Richfield, USA Petroleum Company (“USA”), an independent retail marketer of gasoline, alleged that its competitor, Atlantic Richfield Company (“ARCO”), which sold gasoline through its own stations and indirectly through dealers, violated Sections 1 and 2 of the Sherman Act through a price-fixing scheme that set gasoline prices at below-market but above-cost levels through its offer of short-term discounts, such as volume discounts, and the elimination of credit-card sales to its dealers. See id. at 331-32, 110 S.Ct. at 1887-88. Only USA’s Section 1 claim was before the Court, see id. at 333 n. 3, 110 S.Ct. at 1888 n. 3, and the question presented was whether USA had suffered an antitrust injury by virtue of ARCO’s Section 1 violation, see id. at 335, 110 S.Ct. at 1889. At the time, ARCO’s conduct was regarded as a per se violation of Section 1. See id. (citing Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968), overruled by State Oil Co. v. Khan, 522 U.S. 3, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997)).
First, the Court rejected USA’s claim that it automatically satisfied the antitrust injury requirement because ARCO’s conduct constituted a per se violation of Section 1. 495 U.S. at 336-37, 110 S.Ct. at 1890-91. The Court then turned to USA’s alternative claim that even if it was not *314 entitled to a presumption of injury, it had suffered injury “because of the low prices produced by the vertical restraint.” Id. at 337, 110 S.Ct. at 1891. Rejecting this contention, the Court reasoned that “[wjhen a firm, or even a group of firms adhering to a vertical agreement, lowers prices but maintains them above predatory levels, the business lost by rivals cannot be viewed as an ‘anticompetitive’ consequence of the claimed violation.” Id. Such injury, the Court concluded, “is not antitrust injury; indeed, ‘cutting prices in order to increase business often is the very essence of competition.’ ” Id. at 338, 110 S.Ct. at 1891 (emphasis in original) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 594, 106 S.Ct. 1348, 1359, 89 L.Ed.2d 538 (1986)).
USA argued alternatively that it was “inappropriate to require a showing of predatory pricing before antitrust injury can be established when the asserted antitrust violation is an agreement in restraint of trade illegal under § 1 of the Sherman Act, rather than an attempt to monopolize prohibited by § 2.” Id. at 338, 110 S.Ct. at 1891. As the Court noted, “[pjrice fixing violates § 1, for example, even if a single firm’s decision to price at the same level would not create § 2 liability” because “the price agreement itself is illegal.” Id. at 338, 110 S.Ct. at 1891. USA contended that therefore it had “suffered antitrust injury even if [ARCO’s] pricing was not predatory under § 2 of the Sherman Act.” Id. at 339, 110 S.Ct. at 1891.
In a passage that is significant in the context of the present case, the Court also rejected that contention. It explained:
Although a vertical, maximum-price-fixing agreement is unlawful under § 1 of the Sherman Act, it does not cause a competitor antitrust injury unless it results in predatory pricing. Antitrust injury does not arise for purposes of § 4 of the Clayton Act, until a private party is adversely affected by an anticompetitive aspect of the defendant’s conduct; in the context of pricing practices only predatory pricing has the requisite anti-competitive effect. Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition. Hence, they cannot give rise to antitrust injury.
Id. at 339-40, 110 S.Ct. at 1891-92 (citations omitted and some emphasis added).
The Court observed that it had “adhered to this principle regardless of the type of antitrust claim involved.” Id. at 340, 110 S.Ct. at 1892 (citing Cargill, 479 U.S. at 116, 107 S.Ct. at 492; Brunswick Corp., 429 U.S. at 487, 97 S.Ct. at 696).[14] The *315 Court noted that although “the source of the price competition in [Atlantic Rich-field] was an agreement allegedly unlawful under § 1 of the Sherman Act rather than a merger in violation of § 7 of the Clayton Act ... that difference [wa]s not salient ... [because] [w]hen prices are not predatory, any losses flowing from them cannot be said to stem from an anticompetitive aspect of the defendant’s conduct.” 495 U.S. at 340-41, 110 S.Ct. at 1892 (emphasis in original).
It is, of course, important to understand the significance of Cargill and Atlantic Richfield in the context of this case. Car-gill and Atlantic Richfield involved the question of whether the plaintiffs had suffered antitrust injury, not whether above-cost pricing practices ever can violate Sections 1 and 2 of the Sherman Act or Section 3 of the Clayton Act. Indeed, at the time the Court decided Atlantic Richfield, vertical, maximum-priee-flxing schemes were regarded as per se illegal under Section 1 of the Sherman Act, and the Court assumed in its analysis that even the above-cost scheme at issue in Atlantic Richfield was illegal under Section 1.
Nevertheless, though it was writing in the context of the antitrust injury requirement for the actions, the Court in Cargill and Atlantic Richfield forcefully rejected the notion that the above-cost pricing practices at issue threatened competition at all. See Atl. Richfield, 495 U.S. at 340, 110 S.Ct. at 1892 (“[S]o long as [prices] are above predatory levels, they do not threaten competition.”)] Cargill, 479 U.S. at 116, 107 S.Ct. at 492 (stating that Cargill’s above-cost pricing practices aimed at increasing its market share was not “activity forbidden by the antitrust laws ”) (emphasis added). Because the antitrust laws at issue in this case require to fix liability on it that Eaton’s behavior present a probable threat to or actually negatively impact competition in the relevant marketplace, these pronouncements are important here and should bear on our consideration of the question of whether the particular pricing practices involved in this case are anticompetitive and thus violate the antitrust laws.
Along this same line, other courts of appeals have looked to Atlantic Richfield’s discussion of above-cost pricing practices not only in the context of considering whether the plaintiff has demonstrated antitrust injury but also in considering whether a defendant’s conduct violates the antitrust laws. See Cascade Health Solutions v. PeaceHealth, 515 F.3d 883, 902-03 (9th Cir.2008) (relying on Atlantic Rich-field, among other cases, to hold that bundled discounts are not exclusionary conduct under Section 2 of the Sherman Act unless the discounts result in below-cost pricing); Virgin Atl. Airways Ltd. v. British Airways PLC, 257 F.3d 256, 269 (2d Cir.2001) (stating in the context of a challenge to a volume-discount program that “[a]s long as low prices remain above predatory levels, they neither threaten competition nor give rise to antitrust injury”) (citing Atl. Richfield, 495 U.S. at 340, 110 *316 S.Ct. at 1892) (emphasis added); Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1060-61 (8th Cir.2000) (relying on Atlantic Richfield in concluding that defendant had not violated Section 2 through its above-cost market-share discounts). Similarly, the Supreme Court has invoked Atlantic Richfield’s discussion of below-cost pricing practices in considering whether pricing practices violate the antitrust laws.
Indeed, three years after it decided Atlantic Richfield, the Court reemphasized this principle in concluding that below-cost pricing was necessary to establish liability under Section 2 of the Clayton Act in an attack on a defendant’s pricing practices. In Brooke Group, Liggett, a generic cigarette manufacturer, alleged that Brown & Williamson Tobacco Corporation (“B & W”) violated Section 2 of the Clayton Act when it offered below-cost price-cuts and volume rebates on “orders of very substantial size” to its wholesalers on B & W’s generic cigarettes in an effort to reverse decreasing sales of its branded cigarettes. 509 U.S. at 216-17, 113 S.Ct. at 2584. The Court stated that “whether the claim alleges predatory pricing under § 2 of the Sherman Act or primary-line price discrimination under the Robinson-Pat-man Act, ..., a plaintiff seeking to establish competitive injury resulting from a rival’s low prices must prove that the prices complained of are below an appropriate measure of its rival’s costs” and “that the competitor had a reasonable prospect, or under § 2 of the Sherman Act, a dangerous probability, of recouping its investment in below-cost prices.” Id. at 222-24, 113 S.Ct. at 2587-88 (emphasis added). Because Liggett had failed to provide sufficient evidence that B & W had a reasonable prospect of recouping its allegedly predatory losses, the Court concluded that B & W was entitled to judgment as a matter of law. See id. at 243, 113 S.Ct. at 2598.
Importantly, in explaining the dual requirements set forth above, the Court noted that it had “rejected elsewhere the notion that above-cost prices that are below general market levels or the costs of a firm’s competitors inflict injury to competition cognizable under the antitrust laws.” Id. at 223, 113 S.Ct. at 2588 (citing Atl. Richfield, 495 U.S. at 340, 110 S.Ct. at 1892). In this connection, the Court reiterated Atlantic Richfield’s principle that “‘[l]ow prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition ... regardless of the type of antitrust claim involved.’ ” Id. (quoting Atl. Richfield, 495 U.S. at 340, 110 S.Ct. at 1892). The Court observed:
As a general rule, the exclusionary effect of prices above a relevant measure of cost either reflects the lower cost structure of the alleged predator, and so represents competition on the merits, or is beyond the practical ability of a judicial tribunal to control without courting intolerable risks of chilling legitimate price-cutting.
509 U.S. at 223, 113 S.Ct. at 2588.
The Court again rejected an attack on above-cost pricing practices with its decision in Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., 549 U.S. 312, 320-21, 127 S.Ct. 1069, 1075, 166 L.Ed.2d 911 (2007). Weyerhaeuser involved the unusual situation in which there was an allegation of “predatory bidding,” meaning that a firm with monopoly buying power on the supply side drives up the price of that input to levels at which a competitor cannot compete. Id. at 320, 127 S.Ct. at 1075. Once the monopolist has caused competing buyers to exit the market for the input, “it will seek to re *317 strict its input purchases below the competitive level, thus reducing] the unit price for the remaining input[s] it purchases[,]” thereby allowing the monopolist to reap profits that will offset any losses it suffered in bidding up the input prices. Id. at 320-21, 127 S.Ct. at 1075-76. The issue was whether a plaintiff alleging that a defendant engaged in such conduct was required to demonstrate that the defendant engaged in below-cost pricing through the alleged predatory bidding on the supply side. Due to the theoretical and practical similarities between a claim of predatory pricing and a claim of predatory bidding, the Court concluded that its Brooke Group test applies to predatory bidding claims under Section 2 just as the test applies to Section 2 predatory pricing claims. See id. at 325, 127 S.Ct. at 1078.
In doing so, the Court noted that in Brooke Group it had been “particularly wary of allowing recovery for above-cost price cutting because allowing such claims could, perversely, ‘chil[l] legitimate price cutting,’ which directly benefits consumers.” Id. at 319, 127 S.Ct. at 1074 (quoting Brooke Grp., 509 U.S. at 223-24, 113 S.Ct. at 2588). Accordingly, the Court had “specifically declined to allow plaintiffs to recover for above-cost price cutting, concluding that ‘discouraging a price cut and ... depriving consumers of the benefits of lower prices ... does not constitute sound antitrust policy.’ ” Id., 127 S.Ct. at 1074-75 (quoting Brooke Grp., 509 U.S. at 224, 113 S.Ct. at 2588).
Most recently in Pacific Bell Telephone Co. v. Linkline Communications, Inc., 555 U.S. 438, 129 S.Ct. 1109, 172 L.Ed.2d 836 (2009), the Court extended this principle to “price squeeze” claims. Price squeeze claims allege that a “vertically integrated firm [that] sells inputs at wholesale and also sells finished goods or services at retail” has “simultaneously raise[d] the wholesale price of inputs and cut the retail price of the finished good” thereby “squeezing the profit margins of any competitors in the retail market,” and forcing the competitors to “pay more for the inputs they need ... [and] cut their retail prices to match the other firm’s prices.” Id. at 442, 129 S.Ct. at 1114. The Court noted that “[t]o avoid chilling aggressive price competition, [it] ha[d] carefully limited the circumstances under which plaintiffs can state a Sherman Act claim by alleging that prices are too low.” Id. at 451, 129 S.Ct. at 1120. It reiterated the dual requirements of Brooke Group for predatory pricing claims, and noted, once more, Atlantic Richfield’s principle that “so long as [prices] ... are above predatory levels, they do not threaten competition.” Id. (quoting Atl. Richfield, 495 U.S. at 340, 110 S.Ct. at 1892).[15]
The Supreme Court’s decisions in the above cases require that inferior courts recognize that in general above-cost pricing practices are not anticompetitive and thus do not violate the antitrust laws. Time and time again, the Court has made clear that above-cost pricing practices generally do not threaten competition in the marketplace. Accord Cascade Health Solutions, 515 F.3d at 901 (observing in the context of challenge to bundled discount program that Brooke Group and Weyerhaeuser “strongly suggest that, in the normal case, above-cost pricing will not be considered exclusionary conduct for antitrust purposes”); Concord Boat, 207 F.3d at 1061 (stating in the context of a chal *318 lenge to a market-share discount program that decisions of the Supreme Court “illustrate the general rule that above cost discounting is not anticompetitive”); see also Khan, 522 U.S. at 15, 118 S.Ct. at 282 (“Our interpretation of the Sherman Act also incorporates the notion that condemnation of practices resulting in lower prices to consumers is ‘especially costly’ because ‘cutting prices in order to increase business often is the very essence of competition.”) (internal quotation marks and citation omitted).
As the majority notes, it is also clear that the conditional nature of the price cuts or the fact that the prices and the conditions were memorialized in the LTAs does not render the precedent that I summarize above inapplicable.[16] As noted, both Atlantic Richfield and Brooke Group involved conditional discounts of another type, namely volume rebates, and surely inasmuch as ARCO and B & W both were sophisticated companies that dealt in large-scale transactions, they certainly explained these discounts and the conditions they placed on them to the purchasers of their products whether or not they did so in writing. In any event, the purchasers necessarily knew that they were receiving the discounts when they were afforded them. These cases thus make apparent that the Court’s reluctance to condemn above-cost pricing practices extends not only to direct price cuts but also to conditional pricing practices whether or not they are stated in written agreements. The principle that above-cost pricing practices generally do not threaten competition in the marketplace remains true whether the plaintiff casts its claim in the verbiage of “predatory pricing” and alleges explicitly that defendant’s prices are too low or whether it realizes it cannot do so because the prices were above cost so it instead couches its challenge in the language of exclusive dealing and attacks the agreements that offer the low prices.
In practice, however, a defendant’s pricing practices may include both price and non-price elements. Further, I concur in the majority’s conclusion that notwithstanding the Court’s strong pronouncements favoring above-cost price cuts, the Supreme Court has not held that in every case in which a plaintiff challenges a defendant’s pricing practices the Brooke Group test is dispositive and the plaintiff therefore must demonstrate that there has been below-cost pricing to succeed. See Cascade Health Solutions, 515 F.3d at 901 (noting that “in neither Brooke Group nor Weyerhaeuser did the Court go so far as to hold that in every case in which a plaintiff challenges low prices as exclusionary conduct the plaintiff must prove that those prices were below cost”).[17] But *319 where a plaintiff contends that a defendant’s prices alone were anticompetitive, the Brooke Group price-cost test provides the entire legal framework necessary to evaluate that claim because the Brooke Group price-cost test is designed to measure whether prices are anticompetitive or not. Thus, where a plaintiff challenges a defendant’s pricing practices as exclusive dealing or under any other theory of antitrust liability but in fact alleges only that the defendant’s prices themselves operate as the exclusionary or anticompetitive tool, the Brooke Group test must apply and have dispositive effect.[18] My conclusions *320 in this regard largely mirror those of the majority.
Where I part from my colleagues, however, is with their conclusion that if a plaintiff challenges a defendant’s pricing practices but contends that the non-price aspects of defendant’s conduct, rather than the prices themselves, constituted the anti-competitive conduct, the price-cost test is no longer relevant. While the Supreme Court has not held that the price-cost test is dispositive of all claims that attack a defendant’s pricing practices, it is undeniable that its reasoning in the above eases establishes that courts ought to exercise a great deal of caution before condemning above-cost pricing practices. As the majority notes, in the precedent recited above the plaintiffs grounded their claims in the allegation that defendant’s prices would cause or had caused them harm. Yet the purpose of my summary and my quotation of that precedent in such detail is to bear out the fact that the Court’s holdings rejecting the respective plaintiffs’ challenges in those cases were grounded in the fundamental and broader principle that above-cost pricing practices, even those embodied in discount and rebate programs memorialized in written agreements, generally are not anticompetitive and it is that point that is so critical here.
I believe that it is evident that the Supreme Court’s reasoning with respect to above-costs pricing applies to a plaintiffs challenge to a defendant’s pricing practices even if the plaintiff claims that the non-price aspects of the defendant’s practices were the actual exclusionary tactics. Regardless of what components of Eaton’s rebate program that appellees identify as the anticompetitive conduct, whether it is the prices or the conditions that Eaton attached to those prices, the question the jury considered at the trial and that we face on appeal is whether Eaton’s rebate program and conduct as a whole was pro-competitive or anticompetitive. See LePage’s Inc. v. 3M, 324 F.3d 141, 162 (3d Cir.2003) (en banc) (“[T]he courts must look to the monopolist’s conduct taken as a whole rather than considering each aspect in isolation.”) (citing Cont’l Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962)). Our inquiry in that regard should be an objective one that focuses on the facts of the program and our answer to that question should not turn on the circumstance that appellees had enough foresight specifically not to protest Eaton’s prices.[19]
Eaton’s prices were, of course, the crux of the rebate program and are an inextricable element of the LTAs. Although appellees conveniently chose to ignore Eaton’s prices in formulating their claims, in light of that economic reality and the Supreme Court’s mandate that the inferior courts tread lightly when asked to condemn above-cost pricing practices, the nature of those prices must bear on the question of whether Eaton’s rebate program as a whole was anticompetitive or not. Accordingly, I believe that if, as here, a plaintiff attacks both the price-based and non-priced-based elements of a defendant’s pricing practices, a court should apply and give persuasive effect to the Brooke Group price-cost test such that a firm’s above-cost pricing practices enjoy a presumption of lawfulness regardless of how a plaintiff *321 crafts its claim challenging the practices. This approach honors the Supreme Court’s repeated admonition that above-cost pricing practices are generally procompetitive and that inferior courts must exercise caution before condemning such practices. Furthermore, it has the added virtue of injecting a modicum of predictability into this muddled area of antitrust jurisprudence. This principle is critical in this ease.
I recognize, however, that as is always true with respect to any nonconclusive presumption, there may be an exception to the presumption of lawfulness of above-cost pricing if a plaintiff challenging a defendant’s above-cost pricing practices establishes that the defendant’s conduct as a whole was anticompetitive notwithstanding the pricing aspect of its conduct. In this vein, I acknowledge that, as most contracts offering large-scale quantity discounts necessarily do, the LTAs had other provisions besides the reduced prices themselves, namely, the conditions Eaton attached to those reduced prices, i.e., the market-share targets and the data book placement provisions which appellees attack as anticompetitive. Applying and giving persuasive effect to the Brooke Group price-cost test would not preclude appellees from arguing that the non-price aspects of Eaton’s conduct were anticompetitive even in the absence of below-cost pricing. In practice then, in a case such as this one, the Brooke Group price-cost test would operate only as one element, though a significant one, of a court’s and jury’s inquiry under the rule of reason.
In at least implicitly recognizing the dubious footing of an antitrust mode of analysis that hinges entirely on how a plaintiff crafts its claim, the majority states that a plaintiff may not escape the Brooke Group price-cost test simply by characterizing its claim as one of exclusive dealing but it does allow the plaintiff to avoid application of the test as long as the plaintiff brings an exclusive dealing claim and contends that the non-price aspects of the agreement offering the reduced prices operated as the exclusionary tool. The result of the majority’s approach is that the strong procompetitive justifications driving the Supreme Court’s repeated charge that inferior courts exercise caution before condemning above-cost pricing practices suddenly disappear so long as the plaintiff is clever enough to claim that the non-price aspects of the defendant’s pricing practices, not the prices themselves, were anticompetitive. I do not believe that this is the result the precedent requires or prudence counsels.
I reject the notion that a plaintiff may engage in such legalistic maneuvering in an effort to circumvent the Supreme Court’s charge that a court look with a skeptical eye at attacks on above-cost pricing practices. The non-price aspects of the LTAs which appellees challenge, namely the market-share targets and the data book placement provisions, and indeed the LTAs themselves would not exist without the reduced prices that Eaton offered as an incentive for the OEMs to enter the agreements. Conceptually severing the conditions Eaton attached to those prices ignores the economic realities of this case and allows a plaintiff essentially to commandeer a court’s analysis through artificial distinctions.[20] In con- *322 eluding that the Brooke Group price-cost test at least must have persuasive effect in a plaintiffs challenge to a defendant’s pricing practices regardless of how a plaintiff casts its claim, I believe it appropriate to note that although I stand alone in this case, I nonetheless find myself in good company. The leading antitrust treatise, on which the majority also relies,[21] concludes that single-product market-share discounts that do not require exclusivity as a condition of the discount are pro-competitive and thus lawful so long as they remain above-cost. Because that treatise cogently explains why above-cost market-share discounts are generally not anticompetitive and do not constitute unlawful exclusive dealing, I quote it at length:
[Ujnilaterally imposed quantity discounts can foreclose the opportunities of rivals when a dealer can obtain its best discount only by dealing exclusively with the dominant firm. For example, discounts might be cumulated over lengthy periods of time, such as a calendar year, when no obvious economies result. The effect of continuously increasing discounts varies, but they can resemble exclusive dealing in extreme circumstances.
Nevertheless, quantity and market share discounts differ from exclusive dealing in important respects. First, fite buyer need not make any ex ante commitment of long duration to deal with only one firm; as soon as other advantages outweigh the discount, the buyer can switch simply by paying the nondiscounted price. The buyers can also switch if one or more other sellers can match the discount. As long as the discounted price is above cost and not predatory, it can be matched by any equally efficient rival.
Second, the similarity to exclusive dealing is greatest when the product in question is fungible, with buyers indifferent to all characteristics except price. [22] If the product is differentiated, the buyer may wish to purchase a mixture from alternative sellers, notwithstanding one seller’s progressive discount. For example, an appliance seller who has customer demand for four brands of refrigerators is likely to stock all four, even though the seller of one offers progressive discounts for larger purchases.
The effective period over which a firm is ‘locked up’ by a cumulating discount may bear on competitive effects, just as contract duration in excluding dealing cases.... Discounts that are aggregated over a longer period — -say, over all purchases made in one year — may be more problematic. First, however, they cannot have an anticompetitive effect *323 greater than exclusive dealing with one year contracts. Where there are multiple buyers, numerous selling opportunities will come up anew each year. Second, in the great majority of cases they exclude much less than the one-year exclusive dealing contract because an aggressive rival can steal sales by matching the cumulated discount, which mil be the same as the dominant firm’s cumulative discount obligation. Even in such a case, single-item discounts can be matched by an equally efficient rival.
For single-item discounts, no matter how measured or aggregated, injury to an equally efficient rival seems implausible. It is perhaps most plausible where there are a very small number of buyers, entry barriers into the buying market are very high, and buying requires the making of long-term commitments. In that case, aggressive discounting by the monopolist could deprive a rival of most of its patronage. Even here, however, toe would hesitate to condemn a firm for making an above-cost sale that could readily be matched by an equally efficient rival. Competitive injury is not plausible when there are a large number of buyers, particularly when entry barriers into the buying market are low. As the First Circuit did in Barry Wright [Barry Wright Corp. v. ITT Grinnell Corp., 724 F.2d 227, 232 (1st Cir.1983) (Breyer, J.)], we would test illegality by the ordinary rules applying to predatory pricing and allow all above-cost single item discounts.

Given that above-cost discounts can be matched by equally efficient rivals, anticompetitive effects are likely only when the large firm can offer a larger variety of products or services than the smaller firm does. The most common scenario resembles tying.

IA Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 768b, at 148-50 (2d ed. 2000) (emphasis added).
This discussion is set forth in the treatise’s treatment of market-share discounts in the context of Section 2 of the Sherman Act. However, for the same reasons recited above, Areeda and Hovenkamp take the identical position in the context of Section 1 Sherman Act challenges to market-share discounts:
One approach to [market-share discounts] ... is to treat them as exclusive dealing contracts, with the contract period equal to the period over which purchases can be aggregated for purposes of measuring the size of the discount.
If exclusive dealing under equivalent structural conditions and subject to equivalent defenses were lawful, the discount arrangement should be lawful as well. But the competitive impact must in fact be less because any equally efficient rival can take the customer by bidding a better price and even compensating the customer for the loss of the discount from the defendant — assuming, as we have, that the defendant’s program results in above-cost prices at all discount levels.... For these reasons we suggest that discounts attached merely to the quantity of good purchased, and not to exclusivity itself, be treated as lawful, and not be subjected to the laws of exclusive dealing.
The decisions to the contrary involve situations where the defendant aggregates the discount across two or more related products, while the plaintiff produces only one or a subset of these products.
XI Areeda & Hovenkamp, Antitrust Law ¶ 1807b2, at 132-33 (citing LePage’s, 324 *324 F.3d 141) (emphasis added).[23]
The treatise’s reasoning as set forth above is clear and needs little further elaboration from me. While, as noted, the law allows a plaintiff to contend that non-price aspects of a defendant’s pricing practices were anticompetitive under the rule of reason notwithstanding the defendant’s above-cost prices, I believe that the treatise’s extraordinarily detailed economic rationale for concluding that the price-cost test is appropriate in challenges to single-product market-share discounts show that my approach is on firm footing. See also Barry Wright Corp. v. ITT Grinnell Corp., 724 F.2d 227, 232 (1st Cir.1983) (Breyer, J.) (Above-cost prices do not “have a tendency to exclude or eliminate equally efficient competitors. Moreover, a price cut that leaves prices above incremental costs was probably moving prices in the ‘right’ direction — towards the competitive norm.”); Herbert Hovenkamp, Discounts and Exclusion, 2006 Utah L.Rev. 841, 844 (2006) (“One of the factors driving the predatory pricing rule is that, as long as prices are above the relevant measure of cost, the discounts cannot exclude an equally efficient rival. The same is true of single-product discounts.”).
In sum, I reiterate that Supreme Court precedent requires that courts exercise considerable caution before condemning above-cost pricing practices and that in a challenge to a defendant’s pricing practices the Brooke Group price-cost test should apply and be given persuasive effect regardless of whether a plaintiff identifies non-price elements of a defendant’s conduct that it alleges were anticompetitive. Having discussed this critical point, I now turn to the question of whether under the rule of reason analysis and the standards applicable to claims of unlawful exclusive dealing appellees demonstrated that a jury could hold that Eaton violated the antitrust laws notwithstanding its above-cost prices.
B. Clayton Act Section 3 and Sherman Act Section 1 Claims[24]
Appellees contend that the LTAs were anticompetitive exclusive dealing arrangements in violation of Section 1 of the Sherman Act and Section 3 of the Clayton Act. They claim that through the LTAs “Eaton engaged in de facto exclusive dealing agreements and other conduct that denied any other supplier the ability to compete for even 10% of the market.” Appellees’ br. at 43.
In considering this argument, I start with the principle that even explicit exclusive-dealing arrangements, which preclude a buyer from purchasing the goods of another seller, are not per se unlawful. See Race Tires Am., Inc. v. Hoosier Racing Tire Corp., 614 F.3d 57, 76 (3d Cir.2010); United States v. Dentsply Int’l Inc., 399 *325 F.3d 181, 187 (3d Cir.2005). Indeed, “it is widely recognized that in many circumstances exclusive dealing arrangements may be highly efficient — to assure supply, price stability, outlets, investment, best efforts or the like — and pose no competitive threat at all.” Race Tires, 614 F.3d at 76 (quoting E. Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass’n, Inc., 357 F.3d 1, 8 (1st Cir.2004)) (internal brackets omitted); see also Standard Oil Co. of Calif, v. United States, 337 U.S. 293, 306-07, 69 S.Ct. 1051, 1058-59, 93 L.Ed. 1371 (1949) (listing advantages of requirements contracts to both buyers and sellers); Omega Envtl., Inc. v. Gilbarco, Inc., 127 F.3d 1157, 1162 (9th Cir.1997) (“There are ... well-recognized economic benefits to exclusive dealing arrangements, including the enhancement of interbrand competition.”) (citation omitted). As we stated in Race Tires, “[i]t is well established that competition among businesses to serve as an exclusive supplier should actually be encouraged.” 614 F.3d at 83 (citation omitted). “[C]ompetition to be an exclusive supplier may constitute ‘a vital form of rivalry, and often the most powerful one, which the antitrust laws encourage rather than suppress.’ ” Id. at 76 (quoting Menasha Corp. v. News Am. Marketing In-Store, Inc., 354 F.3d 661, 663 (7th Cir.2004)). Of course, “exclusive agreements are not exempt from antitrust scrutiny.” Race Tires, 614 F.3d at 76. “All exclusive dealing agreements must comply with section 1 of the Sherman Act.” Barr Labs., Inc. v. Abbott Labs., 978 F.2d 98, 110 (3d Cir.1992) (citing Am. Motor Inns, Inc. v. Holiday Inns, Inc., 521 F.2d 1230, 1239 (3d Cir.1975)). “Contracts for the sale of goods ... must also comply with the more rigorous standards of section 3 of the Clayton Act.” Id.
While Section 3 requires that a plaintiff demonstrate that it is “probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected,” Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 327, 81 S.Ct. 623, 628, 5 L.Ed.2d 580 (1961) (emphasis added), under a Section 1 rule-of-reason case such as this case “the plaintiff bears the initial burden of showing that the [alleged] agreement produced an adverse, anticompetitive effect within the relevant geographic market,” Burtch v. Milberg Factors, Inc., 662 F.3d 212, 222 (3d Cir.2011) (quotations marks and citation omitted) (emphasis added). Accordingly, if an arrangement “do[es] not infringe upon the stiffer standards of anti-competitiveness under the Clayton Act, ... [it] will also be lawful under the less restrictive provisions of the Sherman Act.” Barr Labs., 978 F.2d at 110 (citing Am. Motor Inns, 521 F.2d at 1250); see also CDC Techs., Inc. v. IDEXX Labs., Inc., 186 F.3d 74, 79 (2d Cir.1999) (“The conclusion that a contract does not violate § 3 of the Clayton Act ordinarily implies the conclusion that the contract does not violate the Sherman Act ....”) (citation omitted); Twin City Sportservice, Inc. v. Charles O. Finley & Co., 676 F.2d 1291, 1304 n. 9 (9th Cir.1982) (“[A] greater showing of anti-competitive effect is required to establish a Sherman Act violation than a section 3 Clayton Act violation in exclusive-dealing cases.”) (citation omitted).[25]
*326 To determine whether it is “probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected” in violation of Section 3, Tampa Electric Co., 365 U.S. at 327, 81 S.Ct. at 628, logically a plaintiff first must establish the share of the market, expressed in a percentage, in which the exclusive dealing arrangement forecloses competition. As the Court of Appeals for the District of Columbia Circuit stated in one of the more notable antitrust cases of the recent past, “[t]hough what is ‘significant’ may vary depending upon the antitrust provision under which an exclusive deal is challenged, it is clear that in all cases the plaintiff must both define the relevant market and prove the degree of foreclosure.” United States v. Microsoft Corp., 253 F.3d 34, 69 (D.C.Cir.2001); see also Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I., 373 F.3d 57, 66 (1st Cir.2004) (“For the exclusive dealing contract, the first step would be [for plaintiff] to show the extent of foreclosure resulting from the ... contract....”); R.J. Reynolds Tobacco Co. v. Philip Morris Inc., 199 F.Supp.2d 362, 388 (M.D.N.C. 2002), aff'd, 67 Fed.Appx. 810 (4th Cir.2003) (“A plaintiff makes out a prima facie case of substantial foreclosure by demonstrating first that a significant percentage of the relevant market is foreclosed by the provision challenged.”).
“The share of the market foreclosed is important because, for the contract to have an adverse effect upon competition, ‘the opportunities for other traders to enter into or remain in that market must be significantly limited.’ ” Microsoft Corp., 253 F.3d at 69 (quoting Tampa Elec. Co., 365 U.S. at 328, 81 S.Ct. at 628-29); see also Jefferson Parish Hosp. Dish No. 2 v. Hyde, 466 U.S. 2, 45, 104 S.Ct. 1551, 1576, 80 L.Ed.2d 2 (1984) (O’Connor, J., concurring) (“Exclusive dealing is an unreasonable restraint on trade [under Section 1 of the Sherman Act] only when a significant fraction of buyers or sellers are frozen out of a market by the exclusive deal.”) (citation omitted); Chuck’s Feed & Seed Co. v. Ralston Purina Co., 810 F.2d 1289, 1294 (4th Cir.1987) (“[T]he courts’ focus in evaluating exclusive dealing arrangements should be on their effect in shutting out competing manufacturers’ brands from the relevant market.”); Perington Wholesale, Inc. v. Burger King Corp., 631 F.2d 1369, 1374 (10th Cir.1979) (“[A] complaining trader [challenging an exclusive-dealing arrangement] must allege and prove that a particular arrangement unreasonably restricts the opportunities of the seller’s competitors to market their product.”) (citation omitted). Thus, “[f]ollowing Tampa Electric, courts considering antitrust challenges to exclusive contracts have taken care to identify the share of the market foreclosed.” Microsoft Corp., 253 F.3d at 69 (citation omitted); see also E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc., 637 F.3d 435, 451 (4th Cir.2011) (noting that “the requirement of a significant degree of foreclosure serves a useful screening function”) (internal quotation marks and citation omitted).
Nevertheless, the antitrust laws tolerate some degree of market foreclosure; Section 3 only condemns an agreement where the foreclosure represents a substantial *327 share of the market. See Standard Fashion Co. v. Magrane-Houston Co., 258 U.S. 346, 357, 42 S.Ct. 360, 362, 66 L.Ed. 653 (1922) (“That ... [Section 3] was not intended to reach every remote lessening of competition is shown in the requirement that such lessening must be substantial.”). Thus, once the plaintiff demonstrates the portion of the market the exclusive-dealing arrangement forecloses, the court must ask whether that level of preemption constitutes a “substantial” share of the market. See Tampa Elec. Co., 365 U.S. at 328, 81 S.Ct. at 628 (In a Section 3 case, the Court must consider the degree of market foreclosure and “the competition foreclosed by the contract must be found to constitute a substantial share of the relevant market.”). There is no fixed percentage at which foreclosure becomes “substantial” and courts have varied widely in the degree of foreclosure they consider unlawful. See R.J. Reynolds Tobacco Co., 199 F.Supp.2d at 388 (collecting cases and noting that “[c]ourts have condemned provisions involving foreclosure as low as 24% while provisions involving foreclosure as high as 50% have been upheld”) (citations omitted).
Under Tampa Electric, however, “the degree of market foreclosure is only one of the factors involved in determining the legality of an exclusive dealing arrangement.” Barr Labs., 978 F.2d at 111 (citation omitted). Indeed, while a negligible degree of foreclosure “makes dismissal easy,” a high degree of market foreclosure does not “automatically condemn” an exclusive-dealing arrangement. Stop & Shop Supermarket, 373 F.3d at 68. Rather, once a plaintiff identifies the degree of market foreclosure, to determine whether that preemption is “substantial,” a court considers not only the quantitative aspect of the foreclosure but also the qualitative conditions of the particular market, such as “the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area,” and the effect “preemption of that share of the market might have on effective competition therein.” Tampa Elec. Co., 365 U.S. at 329, 81 S.Ct. at 629; see also Barr Labs., 978 F.2d at 111. Courts employing Tampa Electric’s market analysis also consider the duration of the agreement, the ease of its terminability, the height of any entry barriers, alternative outlets competitors may employ to sell their product, and the buyer’s and seller’s business justifications for the arrangement. See Concord Boat, 207 F.3d at 1059; Omega Envtl., 127 F.3d at 1163-65; Barr Labs., 978 F.2d at 111; Barry Wright Corp., 724 F.2d at 236-37; R.J. Reynolds Tobacco Co., 199 F.Supp.2d at 389; see also XI Areeda & Hovenkamp, Antitrust Law ¶ 1821d, at 183-88.[26]
*328 In considering whether Eaton’s conduct violated Section 3, I note first that it is undisputed that the LTAs were not by their terms exclusive-dealing contracts. The LTAs did not require the OEMs to purchase any amount, much less all, of their transmission needs from Eaton, and they did not preclude the OEMs from purchasing transmissions from appellees or any other manufacturer. Additionally, the LTAs did not condition the rebates on the OEMs’ purchase of 100% of their transmission needs from Eaton.
In the past, we have expressed doubt as to whether an agreement involving less than all of a customer’s purchases even falls within the ambit of Section 3. See Barr Labs., 978 F.2d at 110 n. 24 (“An agreement affecting less than all purchases does not amount to true exclusive dealing.”) (citation omitted); see also W. Parcel Express v. United Parcel Serv. of Am., Inc., 190 F.3d 974, 976 (9th Cir.1999) (concluding that because volume discount contracts did “not preclude consumers from using other delivery services, they [we]re not exclusive dealing contracts that preclude[d] competition”); Magnus Petroleum Co. v. Skelly Oil Co., 599 F.2d 196, 200 (7th Cir.1979) (“Because the agreements contained no exclusive dealing clause and did not require plaintiffs to purchase any amounts of gasoline that even approached their requirements, they did not violate Section 3 of the Clayton Act.”) (citations omitted).
Indeed, Section 3 explicitly applies only to those agreements entered into “on the condition, agreement, or understanding that the lessee or purchaser ... shall not use or deal in the goods ... of a competitor.” 15 U.S.C. § 14; see also Standard Fashion Co., 258 U.S. at 356, 42 S.Ct. at 362 (Section 3 “deals with consequences to follow the making of the restrictive covenant limiting the right of the purchaser to deal in the goods of the seller only.”).[27] I doubt whether a market-share discount program of the type here, which does not preclude the buyer from dealing in the goods of others and does not even condition the rebate on exclusivity, falls within the statutory reach of that provision. See IIIA Areeda & Hovenkamp, Antitrust Law ¶ 768, at 148 n. 26 (noting that “only the Sherman Act applies” to a claim that a market-share discount amounts to exclusive dealing because “[wjhile § 3 of the Clayton Act, 15 U.S.C. § 14, expressly covers the seller who offers a ‘discount from, or rebate upon’ a sale in exchange for a promise not to deal with others, that is not the same thing as a quantity or market share discount, in which the buyer makes no promise not to deal with others”).[28]
*329 The majority bypasses this obstacle to appellees’ success by stating that a plaintiffs allegation that a contract lacking an express exclusivity requirement nonetheless establishes an unlawful de facto exclusive dealing program sets forth a cognizable antitrust claim. In doing so, the majority also concludes that Section 3 encompasses contracts that require partial exclusivity.
The notion of de facto exclusive dealing has its roots in United Shoe Machinery Corp. v. United States, 258 U.S. 451, 457, 42 S.Ct. 363, 365, 66 L.Ed. 708 (1922), in which the Court held that a contract lacking an express agreement not to use the goods of a competitor falls within the ambit of Section 3 if “the practical effect is to prevent such use.” As noted, the majority appears to interpret this statement as meaning that a contract that has the effect of causing the purchaser to buy most of its needs from one seller falls within Section 3 because it induces near-exclusivity. I disagree with this interpretation and believe instead that United Shoe and its “practical effect” standard stands for the proposition that a contract that is not facially exclusive may nonetheless fall within the ambit of Section 3 if, in the implementation of its terms, it induces actual exclusivity.
In United Shoe, the Court condemned as unlawful exclusive dealing a lease that included, among other things, a forfeiture provision to the effect that if the lessee failed to use exclusively machinery of certain kinds made by the lessor, the lessor had the right to cancel the lessee’s right to use all such machinery, a provision that the lessee would not use the machinery on products that had not received particular operations upon certain of other lessor’s machines, and a clause that required the lessee to purchase its supplies exclusively from the lessor. See id. at 456-57, 42 S.Ct. at 365. Lessees who used the lessor’s competitors’ machines in violation of the terms of the leases “had their attention called to the forfeiture provisions in the leases, which was understood, by many of the lessees, as warnings, in the nature of threats, that unless discontinued these covenants of the leases would be enforced.” United States v. United Shoe Mach. Co., 264 F. 138, 145 (D.C.Mo.1920). These provisions, which the Court noted amounted in reality to “tying agreements,” fell within the scope of Section 3 because they “effectually prevented] the lessee from acquiring the machinery of a competitor of the lessor, except at the risk of forfeiting the right to use the machines furnished by the [lessor].” 258 U.S. at 457-58, 42 S.Ct. at 365. Thus, in practice, the lease induced actual, total exclusivity. Subsequent cases relying on United Shoe’s “practical effect” formulation bear the point out.
In International Business Machines Corp. v. United States, 298 U.S. 131, 135, 56 S.Ct. 701, 703, 80 L.Ed. 1085 (1936), the Court, relying on United'Shoe, concluded that a lease for tabulating machines that required the lessee to use only the tabulating cards of the lessor on its machines fell within Section 3 because in practice it required the exclusive use of the lessor’s cards. The Court explained that while “the condition is not in so many words against the use of the cards of a competitor, but is affirmative in form, that the lessee shall use only appellant’s cards in the leased machines,” because “the lessee can make no use of the cards except with *330 the leased machines, and the specified use of appellant’s cards precludes the use of the cards of any competitor, the condition operates [to prohibit the use of the cards of a competitor] in the manner forbidden by” Section 3 of the Clayton Act. Id. (citing United Shoe, 258 U.S. at 458, 42 S.Ct. at 365); but see FTC v. Sinclair Refining Co., 261 U.S. 463, 474, 43 S.Ct. 450, 453, 67 L.Ed. 746 (1923) (distinguishing United Shoe and concluding that contract that required lessee of gasoline pumps not to use competitor’s gasoline in lessor’s pumps did not fall within Section 3 because the contract did not contain a provision “which obligate[d] the lessee not to sell the goods of another,” and “[t]he lessee [wa]s free to buy [pumps] wherever he cho[se]”). Similarly, in Standard Oil, the Court assumed that Section 3 encompassed “[exclusive supply contracts” that the defendant had entered with its dealers, in which the dealer promised “to purchase from Standard all his requirements of one or more products.” [29] 337 U.S. at 295-96, 69 S.Ct. at 1054.
Accordingly, while Section 3 encompasses agreements that do not contain express exclusivity provisions but in reality induce actual exclusivity, it does not, as the majority seems to believe, encompass agreements that do not contain express exclusivity provisions and do not induce actual exclusivity.[30] Here, not only did the LTAs lack any provision imposing a ban on the OEMs’ purchase of Eaton’s competitors’ products, they did not contain a provision amounting to or having the effect of imposing such a ban. Moreover, the evidence adduced at the trial demonstrates that the LTAs actually did not induce de facto total exclusivity on the part of the OEMs. As noted, from July 2000 to October 2003, ZFM’s share of the [¶] transmission market ranged between 8% and 14%. Thus, the majority, in interpreting the scope of Section 3 to encompass an agreement which neither explicitly forbids nor has the effect of precluding the OEMs from purchasing Eaton’s competitors’ products, has expanded the scope of Section 3 greatly beyond its intent. Section 3 only encompasses agreements that explicitly forbid or have the practical effect of precluding one party from using the goods of another. Nevertheless, despite my serious misgivings on this threshold exclusive-dealing issue, which could justify terminating this discussion now and thus reversing the District Court’s denial of judgment as a matter of law as to appellees’ Section 3 Clayton Act claim, I will assume that the LTAs fall within the theoretical reach of Section *331 3 and proceed to analyze the LTAs under that provision. My analysis, however, does not get very far before it becomes readily apparent that this fundamental flaw in appellees’ case — that the LTAs were not, in fact, exclusive-dealing contracts — is fatal to their claim.
As noted above, under Tampa Electric a plaintiff first must identify the degree of market foreclosure. Despite a lengthy trial in the District Court, which has resulted in the creation of a nine-volume joint appendix and extensive briefing on this appeal, appellees do not identify clearly for us the precise degree of market foreclosure attributable to the LTAs. The majority, however, attempts to make up for appellees’ deficiency in this regard by stating that appellees’ expert, Dr. David DeRamus, testified that the LTAs left only 15% of the market remaining to Eaton’s competitors, or stated another way, that the LTAs foreclosed competition in 85% of the market. In reality, however, Dr. DeRamus did not testify that the LTAs foreclosed competition in 85% of the market. The testimony on which the majority apparently relies for that figure deals not with Dr. DeRamus’ opinion as to the extent to which the LTAs foreclosed competition in the [¶] truck transmission market but rather with Dr. DeRamus’ calculation of Eaton’s market share during the relevant time period in the context of his determination as to whether Eaton had monopoly power. See J.A. at 722 (Dr. DeRamus’ testimony) (explaining the steps he took to ascertain whether “Eaton has monopoly power in the[ ] ... [NAFTA [¶] truck transmission market”); see also J.A. at 4758, 4760 (Dr. DeRamus’ expert report) (setting forth the data reflecting Eaton’s market share). I think it obvious that the inquiry into Eaton’s market share is a question separate and apart from the LTAs’ alleged foreclosure effect[31] and that we may not simply borrow Dr. DeRamus’ testimony as to Eaton’s market share to adduce evidence of the LTAs’ foreclosure effect.
In point of fact, Dr. DeRamus aimed much higher with his estimation of the LTAs’ alleged foreclosure effect by stating explicitly in his expert report that “Eaton’s exclusionary agreements with all four of the heavy-duty truck OEMs — the only significant manufacturers of heavy-duty trucks in the relevant geographic markets at issue in this case — foreclosed nearly 100 percent of the North American market or markets for [¶] [transmissions.” J.A. at 4814 (Dr. DeRamus’ expert report). Dr. DeRamus arrived at this foreclosure percentage on the basis of the market-share targets the LTAs required for the OEMs to receive the rebates.[32]
*332 In denying Eaton judgment as a matter of law, the District Court took a similar view that reliance on the market-share targets was an appropriate method to ascertain the LTAs’ foreclosure effect, concluding that there was sufficient evidence “that the contracts foreclosed a substantial share of the market” not because ZFM identified a specific foreclosure percentage but because “each OEM was required to order 80% or more of its transmissions from” Eaton to receive the rebates. ZF Meritor, 769 F.Supp.2d at 692.[33] While the majority’s reliance on Dr. DeRamus’ testimony regarding Eaton’s market share to ascertain the LTAs’ foreclosure effect is mistaken, it is clear that the majority likewise ultimately concludes that the market-share targets may serve as a measure of the LTAs’ foreclosure effect. For several reasons, however, the market-share targets do not reflect the LTAs’ foreclosure effect, and, on this point, I find that the Court of Appeals for the Ninth Circuit’s and the Court of Appeals for the Eighth Circuit’s treatment of Sherman Act Section 1 challenges to non-exclusive market-share discount programs are instructive.
In Allied Orthopedic Appliances Inc. v. Tyco Health Care Group, 592 F.3d 991, 994-96 (9th Cir.2010), a group of hospitals and health care providers alleged, among other things, that Tyco, a monopolist in the U.S. pulse oximetry sensor market, unlawfully foreclosed competition in the market in contravention of Section 1 of the Sherman Act through its offer of market-share discounts. As here, the market-share agreements provided discounts conditioned on the customers’ purchase of a certain percentage of the product in issue, i.e., pulse oximetry sensors, from Tyco, the discount increasing with Tyco’s increasing market share. “The agreements did not contractually obligate Tyco’s customers to buy anything from Tyco ... and [t]he only consequence of purchasing less than the agreed upon percentage of Tyco’s products was loss of the negotiated discounts.” Id. at 995.
The court of appeals concluded that the agreements did not foreclose competition in violation of Section 1 because the agreements did not require Tyco’s customers to purchase anything from Tyco and because “[a]ny customer subject to one of Tyco’s market-share discount agreements could choose at anytime to forego the discount offered by Tyco and purchase from a generic competitor.” Id. at 997.[34] Thus, Tyco’s competitors “remained able to compete for Tyco’s customers by offering their products at better prices.” Id. at 998.
The Court of Appeals for the Eighth Circuit took a similar view of market-share discount agreements in Concord Boat. In that case, a group of boat builders that sold boats to dealers alleged that Brunswick, the market leader in the manufacture of stern drive engines, violated Section 1 through its offer of market-share discount agreements with the builders and dealers. The agreements offered reduced prices conditioned on market-share targets of 60% to 80%. See 207 F.3d at 1044.[35] *333 As is true here with respect to the product in issue, none of Brunswick’s programs “obligated boat builders and dealers to purchase engines from Brunswick, and none of the programs restricted the ability of builders and dealers to purchase engines from other engine manufacturers.” Id. at 1045.
The court employed the standards of Tampa Electric to conclude that the plaintiffs had “failed to produce sufficient evidence to demonstrate that Brunswick had foreclosed a substantial share of the ... market through anticompetitive conduct” and failed to show that “Brunswick’s discount program was in any way exclusive” in violation of Section 1. Id. at 1059. The court reached that conclusion because the builders were “free to walk away from the discounts at any time,” and “Brunswick’s discounts, because they were significantly above cost, left ample room for new competitors ... to enter the engine manufacturing market and to lure customers away by offering superior discounts.” Id.; see also Se. Mo. Hosp. v. C.R. Bard, Inc., 642 F.3d 608, 612-13 (8th Cir.2011) (rejecting Sherman Sections 1 and 2 and Clayton Section 3 challenge to market-share discount program on the basis of Concord Boat where customers “were not required to purchase 100 percent of their ... needs from ... [defendant] or to refrain from purchasing from competitors” or indeed to purchase “anything from ... [defendant]”); Stitt Spark Plug Co. v. Champion Spark Plug Co., 840 F.2d 1253, 1258 (5th Cir.1988) (affirming district court’s directed verdict in favor of defendant on Section 1 and Section 3 claims where plaintiff “proved no instance in which a distributor honored an exclusive dealing arrangement by refusing to purchase ... [plaintiff’s] plugs, ... there was no testimony that any distributor agreed to refrain from selling competing plugs for any specific period of time, ... [and] [t]here was no evidence that a distributor who failed to abide by the agreement would be subject to any sanction”).
As was true of the contracts at issue in Allied Orthopedic and Concord Boat with respect to what are suggested to be, wrongly in my view, mandatory purchase obligations, the LTAs did not obligate the OEMs to purchase anything from Eaton, much less 100% of their transmission needs, nor did they preclude the OEMs from purchasing transmissions from any other manufacturer. Rather, the agreements provided for increasing rebates and thus lower prices based on the percentage of an OEM’s transmission needs that it purchased from Eaton. In such a circumstance, the LTAs did not foreclose competition in any share of the market because Eaton’s competitors were able to compete for this business as the OEMs were at liberty to walk away from the LTAs at any time.
Indeed, this point is precisely where the Brooke Group price-cost test comes into play. In a situation such as this one, where the contract in terms is not exclusive and merely provides discounted but above-cost prices conditioned upon a market-share target, any equally efficient competitor, including ZFM, if it was an equally efficient competitor, had an ongoing opportunity to offer competitive discounts to capture the OEMs’ business. If Eaton’s discounts had resulted in prices that were below-cost, a charge that appellees do not make, then even an equally-efficient competitor might not have the opportunity to compete for the business the LTAs covered and thus it could be said that competition was foreclosed in that share of the market notwithstanding the non-obligatory *334 and non-exclnsive nature of the LTAs. But we do not need to address that unlikely circumstance because Eaton’s discounts resulted in prices that were above-cost and thus the LTAs “left ample room” for ZFM or new competitors to enter the market and “to lure customers away by offering superior discounts.” Concord Boat, 207 F.3d at 1059. As in Allied Orthopedic, “[t]he market-share discount agreements at issue here did not foreclose ... [Eaton’s] customers from competition because ‘a competing manufacturer need[ed] only offer a better product or a better deal to acquire their [business].’ ” 592 F.3d at 997 (quoting Omega, 127 F.3d at 1164); see also Areeda & Hovenkamp, Antitrust Law ¶ 768b, at 148-50 (concluding that above-cost market-share discounts do not exclude equally efficient rivals because “[a]s long as the discounted price is above cost and not predatory, it can be matched by any equally efficient rival”). Absent evidence that notwithstanding the above-cost prices of the LTAs the non-price aspects of the LTAs rendered them anticompetitive, we should conclude that as a matter of law Eaton’s LTAs were not anticompetitive.
The majority dismisses as inapplicable the reasoning of Allied Orthopedic and Concord Boat by stating that “this is not a case in which the defendant’s low price was the clear driving force behind the customer’s compliance with purchase targets, and the customers were free to walk away if a competitor offered a better price.” Op. at 278. But the reality is to the contrary as the testimony I have summarized establishes it is precisely the case that Eaton’s low prices led the OEMs to enter the LTAs and to strive to meet the market-share targets. Likewise, it is clearly the case that the OEMs were free to walk away from the market-share rebates the LTAs offered at any time. In attempting to overcome this crucial defect in appellees’ claim and concluding that notwithstanding the LTAs’ terms the LTAs were in fact mandatory agreements to which the OEMs were beholden against their will the majority sets forth two justifications.
First, the majority downplays the possibility that ZFM could “steal” Eaton’s customers by offering a superior product or lower price because that possibility did not “prove[ ] to be realistic.” Op. at 285. In other words, the majority appears to assume that because ZFM did not lure away Eaton’s customers through offering superi- or products or lower prices, it could not have done so and the reason for its inability to do so was the LTAs. I find the majority’s treatment of this point to be an unpersuasive answer to the logic of Allied Orthopedic and Concord Boat.
I hardly need make the logical point that one cannot assume that because an event did not happen it could not have happened. It appears that ZFM did not lure away Eaton’s customers. That does not mean, however, that ZFM was incapable of doing so. It is beyond dispute and indeed a central point to this case that ZFM did not offer lower prices than Eaton’s prices and ZFM did not develop a full product line as it knew it had to do in order to compete effectively with Eaton.[36] In other *335 words, ZFM did not even engage in the type of competitive conduct that potentially could have lured away Eaton’s customers. Thus, we cannot say that it is not realistic to think that if it had engaged in that competition conduct ZFM could have been successful.[37]
Second, the majority attempts to overcome this absolutely fundamental defect in appellees’ case by concluding that notwithstanding the fact that the LTAs were not by their terms mandatory and the fact that Eaton’s prices after consideration of the rebates were at all times above-cost such that appellees, were they equally efficient competitors, could have matched them, there nevertheless was sufficient evidence that the LTAs foreclosed competition in a substantial share of the [¶] truck transmission market because “the targets were as effective as mandatory purchase requirements.” Op. at 282. In this regard, the majority reasons that “[cjritically, due to Eaton’s position as the dominant supplier no OEM could satisfy customer demand without at least some Eaton products, and therefore no OEM could afford to lose Eaton as a supplier.” Id. at 283. Therefore, the majority reasons, “a jury could have concluded that, under the circumstances, the market penetration targets were as effective as express purchase requirements because no risk averse business would jeopardize its relationship with the largest manufacturer of transmissions in the market.” Id. (internal quotation marks and citation omitted).
Undoubtedly, there is evidence in the record that the OEMs required Eaton’s products, to the end that an OEM could not have afforded to lose Eaton as a supplier. However, there is not a scintilla of evidence that if an OEM did not meet its LTA’s market-share target Eaton would have refused to supply it with transmissions. First, as the majority notes, only the Freightliner LTA and the Volvo LTA granted Eaton the right to terminate the *336 LTA altogether if the OEM did not meet its market-share targets. Yet the fact that Eaton had the right to terminate those LTAs if those OEMs did not meet their targets — notably, a right that it did not exercise when Freightliner failed to achieve the market-share target in 2002— is no more significant than the fact that Eaton would not have to pay the rebate if Freightliner did not meet the target. Termination of the LTA simply made unavailable the rebates to those OEMs; it did not, as the majority implies, mean that Eaton no longer would provide transmissions to those OEMs. It simply meant that those OEMs would not receive Eaton’s transmissions at the discounted prices the LTAs offered.
I understand that the LTAs are supply agreements that ensure that Eaton will meet the OEMs’ transmission needs and do so at a certain price and under certain conditions, and an OEM lacking a supply agreement may be in an unfavorable position as it would prefer a supply agreement to set the terms of its relationship with Eaton. Nevertheless, although an OEM with a cancelled LTA would have lacked a supply agreement with Eaton, at least temporarily, one cannot infer from that fact that Eaton would not have supplied the OEM with its transmissions. Furthermore, the majority glosses over the fact that PACCAR’s and International’s LTAs did not include a provision granting Eaton the right to terminate the LTAs if those OEMs did not meet their respective market-share targets.
Nevertheless, regardless of whether the LTAs granted Eaton a right of termination, the majority’s suggestion that the OEMs faced losing Eaton as a supplier if they failed to meet the market-share targets is contradicted by the market reality that while Eaton was the largest manufacturer of transmissions in the market there were only four OEMs that bought Eaton’s transmissions. Accordingly, the idea that Eaton could or would have refused to deal with one of the OEMs in addition to being unsupported by the record is irrational from an economic viewpoint for if Eaton had done so it would have turned its back on a significant purchaser of its products measured in sales volume. The notion is completely unjustified.
Perhaps if appellees had produced evidence at the trial that Eaton had threatened to refuse to supply transmissions to an OEM that did not meet its market-share targets the non-mandatory market-share targets would have taken on an air of the mandatory threats that the majority insists they actually were. Literally the only evidence that I can identify relating to this contention is deposition testimony by a Volvo representative relaying an email he had received from one of his colleagues in which the colleague stated that Volvo needed to meet its market share target because if it was not successful it faced “a big risk of cancellation of the contract, price increases and shortages if the market is difficult,” J.A. at 688, and a sentence from an internal Volvo presentation in which it speculated that if Eaton terminated its LTA it would have “[n]o delivery performance commitment (possibly disastrous),” id. at 2101. While I understand that we view a jury’s verdict through a deferential lens, even under that standard I cannot conclude that one sentence of second-hand speculation from a contracting party but not from Eaton as to whether Eaton might provide an OEM with an insufficient volume of transmissions in the event of a market shortage and an unidentified Volvo representative’s statement that if it did not have a delivery performance commitment from Eaton it could be potentially disastrous is sufficient to sustain the inference that facially voluntary market-share targets were in reality *337 the mandatory, almost extortionary, provisions the majority makes them out to be.[38]
I must address also an aspect of the majority’s reasoning on this point that I find to suffer from a serious flaw with dangerous implications for antitrust jurisprudence. Perhaps the majority does not believe that any evidence was required to rebut the reality that even though the market-share targets were facially voluntary, the mere circumstances that Eaton was the dominant supplier in the market and that no OEM could afford to lose it as a supplier sufficed to render the LTAs mandatory. The majority’s reasoning in this regard literally would mean that had Eaton not been the dominant supplier of [¶] truck transmissions in the NAFTA market, there would not have been sufficient evidence for the jury to conclude that the LTAs were de facto exclusive. While I realize that monopolists may face more constraints on their conduct under the antitrust laws than less dominant firms, see LePage’s, 324 F.3d at 151-52, it is an unfair and unwarranted leap to create the specter of coercion out of reference to Eaton’s market dominance, cf. R.J. Reynolds, 199 F.Supp.2d at 392 (“The strong position of Marlboro, however, does not, standing alone ‘coerce’ retailers into signing ... [market-share] agreements.”). In sum, I cannot ascribe to the view that a non-mandatory, non-exclusive contract is transformed magically into .a mandatory, exclusive contract by virtue of reference to the firm’s market position alone such that dominant firms must be wary when they enter voluntary contracts that offer rebates or discounts lest a court later permit a jury to interpret those contracts as mandatory simply due to that firm’s dominant position.
Apart from insinuating that Eaton’s dominant market position coerced the OEMs into meeting the market-share targets, the majority adds to the picture of coercion it attempts to paint by stating that “there was evidence that Eaton leveraged its position as a supplier of necessary products to coerce the OEMs into entering into the LTAs.” Op. at 285. Relatedly, the majority states that appellees “presented testimony from OEM officials that many of the terms of the LTAs were unfavorable to the OEMs and their customers, but that the OEMs agreed to such terms because without Eaton’s transmissions, the OEMs would be unable to satisfy customer demand.” Id.
In point of fact, there is not a trace of evidence beyond appellees’ own baseless accusations and the majority does not bring our attention to any such evidence supporting its rather serious accusation that Eaton leveraged its position as a monopolist to force the OEMs to enter into agreements that the OEMs did not want to enter.[39] Eaton’s offer of lower prices to *338 the OEMs in the form of rebates and direct payments in an effort to gain their business is hardly coercion. Rather, it is nothing more than legitimate good business practice. See Race Tires, 614 F.3d at 79 (“[I]t is no more an act of coercion, collusion, or improper interference for [suppliers] ... to offer more money to [customers] ... than it is for such suppliers to offer the lowest ... prices.”).
Likewise, there is no evidence that the LTAs represented unfavorable arrangements for the OEMs such that the OEMs only agreed to enter the contracts out of fear of losing Eaton as a supplier.[40] Indeed, to the extent one may be tempted to infer that the market-share targets were so high as to be unfavorable to the OEMs I note that the targets were actually very close to or in fact below Eaton’s preexisting market share at three out of the four OEMs measured at a time before the adoption of the LTAs during which appellees do not claim that Eaton was violating any law. See J.A. at 4779 (Dr. DeRamus’ expert report) (Eaton’s LTA with International began providing rebates at 80% market share but Eaton’s market share of International’s transmission needs prior to the LTA already was 79%); id. at 4785 (Eaton’s LTA with PACCAR provided rebates beginning at 90% but Eaton’s market share “consistently hover[ed] around 90% or higher for [¶] transmissions” with PACCAR prior to the LTA); id. at 4793 (Eaton’s LTA with Volvo provided a rebate starting at 65% market share but Eaton’s market share of Volvo’s transmissions was 85% when they entered the LTA in 2002.). The reality that the market share levels that Eaton reached prior to the adoption of the LTAs makes it, in a word I do not like using but fits perfectly here, ridiculous to conclude that the LTAs had a coercive effect on the OEMs.
After studying the majority’s treatment of the LTAs I am left with the impression *339 that it pictures Eaton representatives as using coercion when they handed the OEM representatives the LTAs. Yet the reality is that there is absolutely no evidence in the record suggesting that Eaton compelled the OEMs by the threat of punishment to agree to the LTAs or compelled them to meet the share targets.[41] Quite to the contrary, the record is replete with evidence, as I have summarized above, that shows that far from cowering under Eaton’s “threats,” the OEMs entered into the LTAs in furtherance of their own economic self-interests and because those agreements provided the best possible prices and assurance of a full product line supply. They worked to meet the market-share targets because by achieving those targets they received discounted prices.
Tellingly, the evidence also shows that the OEMs used those arrangements to their advantage. An illuminating example of this market reality is found in a letter an International representative wrote to ZFM in June 2002, in which the representative recounted the [¶] truck market’s dramatic slump and stated to ZFM that:
In the last 12 months, your competition has supported our need for cost control with price reductions consistent with the trend in new truck pricing. In addition, one of your competitors [i.e., Eaton] has offered International a compelling incentive to increase their sales at your expense. As a result, International is seriously considering shifting your portion of our buy to alternative suppliers.
International values the relationship our companies have created over the years. However, the relationship is in jeopardy if your lack of cost eompetitiveness cannot be overcome. We therefore require a 5% across the board price reduction effective August 1, 2002.
J.A. at 4596 (letter from Paul D. Barkus, International, to Robert S. Harrison, ZFM (June 18, 2002)). In fact, the record shows that six months prior to this correspondence, International had attempted to use its relationship with Eaton as leverage to gain further cost reductions from ZFM. See id. at 3727 (electronic mail from Paul D. Barkus, International, to Galynn Skelnik, International (Jan. 11, 2002)) (“I got a phone message from [ZFM] ... stating that after much internal discussion they have decided not to offer any transmission reductions even though their list prices could be increased.... Our strategy was to give Meritor the impression that our Partnership with Eaton provided us with [¶] reductions that would increase Meritor’s list price if they didn’t offset the widened price gap. That started out as a bluff, but when we look at our option prices between the two suppliers] there appears to be some cost/price inconsistency.”). In sum, because appellees failed to produce evidence to show that the LTAs and their voluntary, above-cost market-share target rebates could have or did foreclose competition in any, much less a substantial, share of the market, notwithstanding the jury’s verdict it is obvious that appellees’ claims must fail under Tampa Electric.
Before moving on, I think it appropriate to make a final point on the importance of the Tampa Electric standard and to illuminate fully why I depart from the majority’s application of that case. As I already have noted, exclusive-dealing contracts are not per se unlawful and, indeed, may lead to *340 more competition in the marketplace as firms compete for such potentially lucrative arrangements. Accordingly, one must ask why antitrust law ever would forbid such contracts. The reason, as the Supreme Court’s Tampa Electric standard makes clear, is that where there is such an agreement, the seller’s competitors cannot compete for the percentage of the market that a purchaser needs because the purchaser has signed a contract to deal only in the goods of that particular seller (or has signed a contract that has that practical effect). Even if the seller’s competitors can offer a better deal to the purchaser, the purchaser is precluded from accepting competing offers because they have entered the exclusive-dealing arrangement. Cf. Standard Oil, 337 U.S. at 314, 69 S.Ct. at 1062 (requirements contract violated Section 3 because “observance by a dealer of his requirements contract with Standard does effectively foreclose whatever opportunity there might be for competing suppliers to attract his patronage, and ... the affected proportion of retail sales of petroleum products is substantial”). Therefore, competition is foreclosed in that percentage of the marketplace and under Tampa Electric the question is simply whether that foreclosure is substantial, considering the quantity of the foreclosure and the qualitative aspects of the marketplace and the agreement itself.
It is that foreclosure of competition, the elimination of the possibility that the seller’s competitors can capture that portion of the market through vigorous competition, with which Section 3 (and Section 1 of the' Sherman Act in exclusive-dealing cases) is concerned. See Tampa Elec. Co., 365 U.S. at 328, 81 S.Ct. at 629 (emphasis added) (observing that “the ultimate question” is “whether the contract forecloses competition in a substantial share of the line of commerce involved”). The Tampa Electric market-foreclosure analysis thus assumes that a circumstance existed which appellees seek and fail to prove existed here: that there was an exclusive-dealing arrangement between a market seller and purchaser.
Now consider the case at hand. The parties do not dispute that the LTAs did not require the OEMs to purchase anything, much less 100% of their needs, from Eaton and appellees do not contend that Eaton’s prices were below cost. Accordingly, appellees remained free at all times to compete for the OEMs’ (and the truck purchasers’) business. Appellees, if they were equally efficient competitors, were at liberty to offer lower prices, better products, more logistical and technical support, or any other myriad considerations to make their products more attractive to the OEMs, and the OEMs and the truck purchasers were at all times free to accept appellees’ products and services. Accordingly, the LTAs did not foreclose competition in any portion of the market. This basic point — that the LTAs were not in fact exclusive-dealing arrangements that foreclosed competition in any portion of the market — explains appellees’ failure to identify before us any credible, precise percentage of market foreclosure. Appellees’ failure to meet their burden under Tampa Electric to prove any quantitative degree of market foreclosure should spell the end of their Section 3 and Section 1 claims.
Although I believe that appellees’ failure in this regard renders unnecessary discussion of the qualitative analysis under Tampa Electric, I note briefly that contrary to the majority’s discussion, the qualitative inquiry elucidates further why the LTAs did not violate Section 3. Contrary to the majority’s statement that the long duration of the contracts added to their alleged anticompetitiveness, the duration of the LTAs is of little to no significance because *341 they did not actually preclude the OEMs from purchasing competitors’ products at anytime during the life of the LTA. Because the OEMs were free to walk away from the discounts at any time it does not matter how long Eaton promised to offer those discounts to the OEMs.
Moreover, a claim of lack of ease of terminability is likewise a non-starter given the LTAs were terminable at will; the agreements simply would have lost their force once the OEMs decided to seek Eaton’s competitors’ products and forego the market-share rebate.[42] The majority denies that the LTAs were easily terminable by reasoning that “the OEMs had a strong economic incentive to adhere to the terms of the LTAs, and therefore were not free to walk away from the agreements.” Op. at 287. I reject the majority’s ipse dixit reasoning on this point. While Eaton offered through the LTAs financial incentives that undoubtedly served as the OEMs’ motivation to meet the market-share targets, the LTAs’ promise of financial reward does not mean that the OEMs were not at liberty to leave the LTAs behind to take up a more attractive offer. Economic incentives are by their nature fluid and the OEMs’ incentives might have shifted in the face of a more financially appealing option.
Additionally, “[t]he existence of legitimate business justifications for the contracts also supports the legality of the ... contracts.” Barr Labs., 978 F.2d at 111. In this regard, evidence that the defendant’s actions were motivated by an ordinary business motive is significant. See Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 608, 105 S.Ct. 2847, 2860, 86 L.Ed.2d 467 (1985) (noting that “[pjerhaps most significant ... is the evidence related to [defendant] itself, for [defendant] did not persuade the jury that its conduct was justified by any normal business purpose”). Eaton contends that the LTAs were designed to meet the OEMs’ demands to lower prices by consolidating their component part suppliers and that the OEMs entered the contracts because they afforded the best possible prices. As I noted above, the record supports this assertion as representatives from each of the OEMs testified that the OEMs entered into the LTAs because those agreements were financially attractive, and ZFM itself noted in 2001 that the OEMs sought a single-source supplier.[43] Additionally, an Eaton representative testified that when the OEMs increase their purchases of Eaton’s products, Eaton is able to “translate that volume into [a] lower cost base, [and] come up with the funds and the revenue to give them [the OEMs] more competitive pricing, which is what they were asking for.” J.A. at 1398.
In a similar circumstance, we concluded that a defendant drug manufacturer offered valid business justifications to defeat its competitor’s Section 1 and Section 3 *342 claims, which attacked the defendant’s offer of contracts that provided volume-based discounts to warehouse chain drug stores. See Barr Labs., 978 F.2d at 104-05. We found that there were “legitimate business justifications for the contracts” because “the evidence established that the warehouse chains [that carried defendant’s products] entered the contracts because of the inherent advantages they saw in them in price, convenience, and service” and “[t]he contracts also proved advantageous from Abbott’s perspective in terms of reaping business goodwill, and as providing high volume, low transaction cost outlets for Abbott’s manufacturing capacity.” Id. at 111; see also Virgin Atl. Airways, 257 F.3d at 265 (finding that defendant proffered pro-competitive justification for market-share incentive agreement because such agreements “allow firms to reward their most loyal customers” and “[r]ewarding customer loyalty promotes competition on the merits”); Barry Wright, 724 F.2d at 237 (finding legitimate business justification for requirements contracts because for the purchaser “the contracts guaranteed a stable source of supply, and, perhaps, more importantly, they assured [the purchaser] a stable, favorable price” and for the seller “they allowed use of considerable excess ... [product] capacity and they allowed production planning that was likely to lower costs”).
Undoubtedly, Eaton was motivated to tender the LTAs because of its desire to increase sales of its product. Although such a motivation could not excuse otherwise anticompetitive conduct, the desire to sell more product is an ordinary business purpose, and the antitrust laws do not prohibit such motivation. As the Supreme Court stated in Cargill, “competition for increased market share [] is not activity forbidden by the antitrust laws. It is simply ... vigorous competition.” 479 U.S. at 116, 107 S.Ct. at 492 (emphasis added); see also Concord Boat, 207 F.3d at 1062 (noting that defendant’s proffered reason that it was “trying to sell its product” through market-share discounts constituted valid, pro-competitive business justification for program); Steams Airport Equip. Co. v. FMC Corp., 170 F.3d 518, 524 (5th Cir.1999) (observing that defendant’s explanation that “it was trying to sell its product” was valid business justification).
Tampa Electric makes clear that “it is the preservation of competition which is at stake” under Section 3. 365 U.S. at 328, 81 S.Ct. at 628 (emphasis added and internal quotations marks and citation omitted). Here, appellees remained free at all times to compete for the OEMs’ business and directly for customers’ business and yet the majority permits a jury to condemn the LTAs. I cannot join in that conclusion. Appellees failed to supply an evidentiary basis to establish that the LTAs had the probable effect of foreclosing competition in a substantial share of the market and thus they failed to produce evidence that could demonstrate that Eaton violated Section 3 of the Clayton Act. Because Section 3 of the Clayton Act sweeps more broadly than Section 1 of the Sherman Act, appellees likewise failed to show that Eaton violated Section 1.
C. Sherman Act Section 2 Claim
Appellees presented the same evidence and same de facto exclusive dealing theory on which they based their Section 2 claim as they did to support their Clayton Act Section 3 and Sherman Act Section 1 claims. In light of my lengthy analysis of appellees’ other claims, I will abbreviate my discussion of their Section 2 claim.
Section 2 targets defendants who “monopolize or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the *343 trade or commerce among the several States, or with foreign nations.” 15 U.S.C. § 2. To establish a Section 2 violation, a plaintiff must show that: (1) the defendant possessed monopoly power in the relevant market and (2) the defendant willfully acquired or maintained that power “as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.” Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 481, 112 S.Ct. 2072, 2089, 119 L.Ed.2d 265 (1992) (quoting United States v. Grinnell Corp., 384 U.S. 563, 570-71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966)). Eaton acknowledges that it has monopoly power in the NAFTA [¶] truck transmission market, and thus I focus my discussion on whether it has maintained that monopoly through unlawful means.
A monopolist willfully acquires or maintains monopoly power in contravention of Section 2 if it “attempt[s] to exclude rivals on some basis other than efficiency.” Aspen Skiing Co., 472 U.S. at 605, 105 S.Ct. at 2859. “Anticompetitive conduct may take a variety of forms, but it is generally defined as conduct to obtain or maintain monopoly power as a result of competition on some basis other than the merits.” Broadcom Corp. v. Qualcomm Inc., 501 F.3d 297, 308 (3d Cir.2007) (citation omitted). “[Exclusive dealing arrangements can be an improper means of maintaining a monopoly.” Dentsply, 399 F.3d at 187 (citing Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698; LePage’s, 324 F.3d at 157).
The District Court denied Eaton’s motion seeking a judgment as a matter of law on appellees’ Section 2 claim as it concluded that “[t]he jury found that [Eaton] had willfully acquired or maintained its monopoly power through LTAs that amounted to de facto exclusive dealing contracts having the power to foreclose competition from the marketplace.” ZF Meritor, 769 F.Supp.2d at 697 (emphasis added). In this regard, the Court concluded that “ ‘neither proof of exertion of the power to exclude nor proof of actual exclusion of existing or potential competitors is essential to sustain a charge of monopolization under the Sherman Act.’ ” Id. (quoting LePage’s, 324 F.3d at 148).
The District Court’s finding on this point reflected its misunderstanding of the requirements of Section 2. As we recently stated in Dentsply:
Unlawful maintenance of a monopoly is demonstrated by proof that a defendant has engaged in anti-competitive conduct that reasonably appears to be a significant contribution to maintaining monopoly power. Predatory or exclusionary practices in themselves are not sufficient. There must be proof that competition, not merely competitors, has been harmed.
399 F.3d at 187 (citing LePage’s, 324 F.3d at 162) (emphasis added) (citations omitted); see also Broadcom, 501 F.3d at 308 (“[T]he acquisition or possession of monopoly power must be accompanied by some anticompetitive conduct on the part of the possessor.”) (citing Verizon Commc’ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 407, 124 S.Ct. 872, 878-79, 157 L.Ed.2d 823 (2004)).
Indeed, in Dentsply we made clear that a plaintiffs demonstration that the defendant merely possessed the power to exclude is not a sufficient basis on which to build a claim that the defendant is culpable under Section 2; a plaintiff must show that the defendant used its power to foreclose competition. See 399 F.3d at 191 (“Having demonstrated that Dentsply possessed market power, the Government must also establish the second element of a Section 2 claim, that the power was used ‘to foreclose competition.' ”) (quoting United States v. *344 Griffith, 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948)) (emphasis added). As the Supreme Court explained in Trinko:
The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system. The opportunity to charge monopoly prices — at least for a short period — is what attracts ‘business acumen’ in the first place; it induces risk taking that produces innovation and economic growth. To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anti-competitive conduct.
540 U.S. at 407, 124 S.Ct. at 879 (emphasis in original).
“Conduct that merely harms competitors ... while not harming the competitive process itself, is not anticompetitive.” Broadcom, 501 F.3d at 308; see also Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 458, 113 S.Ct. 884, 892, 122 L.Ed.2d 247 (1993) (The Sherman Act “directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself.”). To determine whether a practice is anticompetitive in violation of Section 2, we consider “whether the challenged practices bar a substantial number of rivals or severely restrict the market’s ambit.” Dentsply, 399 F.3d at 191 (citations omitted). Thus, the standard for ascertaining whether certain conduct is anticompetitive under Section 2 is quite similar to the market-foreclosure analysis under Section 3 of the Clayton Act. “Conduct that impairs the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way may be deemed anticompetitive.” W. Penn Allegheny Health Sys., 627 F.3d at 108 (internal quotation marks and citation omitted).
Accordingly, for largely the same reasons that appellees’ Section 3 and Section 1 claims fail, so, too, does their Section 2 claim. Because the LTAs did not obligate the OEMs to purchase anything from Eaton and did not condition the rebates on Eaton having a 100% market share and because its prices were at all times above-cost, the LTAs allowed any equally efficient competitor, including appellees, if they were equally efficient competitors, to compete. Thus, the LTAs did not bar Eaton’s competitors from the market nor did the LTAs impair their opportunities to compete with Eaton for the business the LTAs covered. Cf. NicSand, Inc. v. 3M Co., 507 F.3d 442, 452 (6th Cir.2007) (en banc) (plaintiff failed to demonstrate antitrust injury under Sherman Act Section 2 because defendant’s rebates and up-front payments to retailers pursuant to exclusive dealing contract were above-cost).
In this regard, the LTAs stand in stark contrast to the contracts at issue in Dents-ply, a case on which appellees and the majority rely heavily. In Dentsply we considered whether Dentsply, a monopolist in the field of the production of artificial teeth, violated Section 2 of the Sherman Act through a provision called “Dealer Criterion 6” in its contracts with dealers, who, in turn, sold the products to dental laboratories. See 399 F.3d at 184-85. The provision, which Dentsply “imposed ... on its dealers” prohibited the dealers from adding non-Dentsply tooth lines to their product offering. See id. Dealers who carried competing lines prior to the implementation of Dealer Criterion 6 were permitted to continue carrying non-Dentsply products, but Dentsply enforced Dealer Criterion 6 against all other dealers. See id.
We concluded that Dealer Criterion 6 violated Section 2 because “[b]y ensuring *345 that the key dealers offer Dentsply teeth either as the only or dominant choice, Dealer Criterion 6 ha[d] a significant effect in preserving Dentsply’s monopoly.” Id. at 191. We noted that “Criterion 6 impose[d] an ‘all-or-nothing’ choice on the dealers” and “[t]he fact that dealers ha[d] chosen not to drop Dentsply teeth in favor of a rival’s brand demonstrates that they ha[d] acceded to heavy economic pressure.” Id. at 196. Accordingly, we concluded that Dealer Criterion 6 harmed competition by “keeping] sales of competing teeth below the critical level necessary for any rival to pose a real threat to Dentsply’s market share.” Id. at 191. Criterion 6 so limited competitors’ sales because Dentsply’s competitors realistically could not hope to compete solely through direct sales to laboratories and because “[a] dealer locked into the Dents-ply line [wa]s unable to heed a request for a different manufacturers’ product....” Id. at 194.
Unlike Dealer Criterion 6, the LTAs did not impose an “all-or-nothing” choice on the OEMs because they did not prohibit the OEMs from purchasing or from offering to its [¶] truck purchasers non-Eaton transmissions. Accordingly, the LTAs did not suppress sales of appellees’ products because the OEMs were able to and, in fact, did heed truck purchasers’ requests for ZFM’s products. Critically, at all times, truck purchasers retained the freedom to make the ultimate decision with respect to the transmissions they would select. Thus, the situation here differs from that in Dentsply because the LTAs did not have the effect of making Eaton the only choice for truck purchasers nor did it impair the purchasers’ choice in the marketplace. See J.A. at 1530 (deposition testimony of Paul D. Barkus, International) (indicating that International’s LTA included a clause explicitly stating that International was not precluded from dealing in Eaton’s competitors’ products because International “would never jeopardize a condition of sale based on a customer specifying a product that [it] would refuse to provide”).
Adding to the specter of restricted customer choice, the majority states that the OEMs worked with Eaton to force feed Eaton’s products to customers and to shift truck fleets from using ZFM transmissions to Eaton transmissions. It appears that there is some evidence in the record for the unsurprising contention that the OEMs sought to meet the market share targets and thus obtain the rebates in part by persuading their customers to select Eaton’s products. Indeed, in all walks of life if a salesperson has more to gain by selling a customer product X as opposed to product Y it is to be expected that the salesperson will push the customer to select product X. Ultimately, however, the majority does not and cannot dispute the fact that the [¶] truck purchasers at all times were free to select any transmission, including ZFM’s transmissions, for their truck orders.
Though appellees also assert that the LTA provisions that required the OEMs to list Eaton’s products as the preferred and standard option in their data books constituted anticompetitive conduct, those provisions no more support appellees’ ease than the rebates that the LTAs provided. Appellees claim that the provisions were anti-competitive because they required the OEMs to charge artificially higher prices for ZFM’s products than for Eaton’s. This is not the case, however, because the terms of the LTAs only required that the OEMs ensure that Eaton was priced as the lowest-cost option, which, with respect to the OEMs, was at all times the case.
As a PACCAR representative explained, a component part manufacturer “is going *346 to get a preferred position in the data book as long as ... [it is] competitive in the marketplace, and being competitive in the marketplace means that ... [it has] the lowest total cost to PACCAR, total cost, not just price, total cost.” Id. at 1553. A competitor manufacturer’s product will be listed “at a premium ... because that other transmission ... is at a higher cost to PACCAR.” Id. at 1552. Indeed, that representative confirmed that data book positioning was in fact “a leverage point for [PACCAR] to negotiate ... [to] manage [its] supply base.” Id. at 1553. Accordingly, Eaton’s demand that the OEMs preferentially price its products reflected the fact that those transmissions came at the lowest cost to the OEMs and the fact that Eaton had made certain price concessions to the OEMs in exchange for that favorable listing, a practice that was apparently commonplace in the [¶] track transmission market.
Furthermore, the demand had the added consequence of assuring Eaton that it receive the favorable promotion for which it had bargained through its price concessions. If the LTAs did not include requirements regarding data book placement, an OEM would have been able to purchase Eaton’s transmissions at a low cost while listing Eaton’s products at a higher cost to the truck purchasers than ZFM’s products in its data book, thereby reaping a greater profit on Eaton’s transmissions. It was entirely reasonable for Eaton to avoid this scenario by insisting that the OEMs’ data books reflect that Eaton’s transmissions were the lowest-cost, highest-value product.
As the majority notes, it is unclear from the record whether the OEMs arrived at the preferential price by lowering the price of the preferred option or by raising the price of the non-preferred options until the preferred component part was the lowest-cost option. The LTAs simply required that the OEMs list Eaton as the preferred option but they did not require that the OEMs take either path in doing so, and thus it appears that the OEMs had the discretion to decide in which way they would make Eaton the preferred option. Of course, from the OEMs’ perspective, keeping the price of Eaton’s products stable and raising the price of Eaton’s competitors’ products was the more financially attractive option than keeping the prices of Eaton’s competitors’ products stable and dropping the price of Eaton’s products and, as the majority points out it appears there is some evidence in the record that the OEMs took the first path.[44]
Nevertheless, to the extent that the OEMs in some instances may have decided *347 to ZFM’s raise the cost of transmissions to arrive at the preferential price for Eaton’s transmissions or to make Eaton’s transmissions appear more favorable to their customers in an effort to achieve the market-share targets and receive the rebates, such conduct reasonably cannot be attributed to Eaton as neither the LTAs nor Eaton elsewhere required that the OEMs do so. Additionally, it is clearly telling with respect to data book placement provisions that prior to 2001 Meritor had a three-year LTA with Freightliner, under which Meritor reduced the prices of its component parts if Freightliner listed those parts as the standard option. Furthermore, there is evidence in the record that as of June 2002, ZFM itself was attempting to achieve exclusive listing in PACCAR’s data book. See id. at 3394 (electronic correspondence from Tom Floyd, PACCAR, to Christian Benner, ZFM (June 4, 2002)) (noting that PAC-CAR was “extremely disappointed” with ZFM’s business proposal in part because PACCAR was “very clear that” ZFM’s proposal “should not include requirements regarding exclusive positioning]” and that “it would require some extraordinary benefits for PACCAR in order [for ZFM] to receive consideration” in that regard).
While Meritor’s prior LTA and ZFM’s own attempts to achieve exclusive data book positioning do not, in themselves, defeat appellees’ claim that those tactics are anticompetitive, their actions are of some significance. Cf. Race Tires, 614 F.3d at 82 (noting fact that plaintiff created and championed racing sanctioning bodies’ rule that required the use of a single brand of tire during races and later alleged such rule violated the antitrust law); NicSand, 507 F.3d at 454 (plaintiffs prior use of exclusive-dealing contract undermined its attack on defendant’s use of such arrangements). At a minimum, ZFM’s conduct belies its contention that the LTAs were far afield from the normal practice of the [¶] truck transmission market.
In our consideration of this case we should remember that “[antitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue.” Trinko, 540 U.S. at 411, 124 S.Ct. at 881. Practices from industry to industry do not come on a one-size-fits-all basis. Here, it appears that bargaining between the OEMs and their suppliers regarding data book positioning is quite typical of the marketplace with which we are dealing. See Race Tires, 614 F.3d at 79 (noting as relevant that it was “a common and generally accepted practice for a supplier to provide a sports sanctioning body ... financial support in exchange for a supply contract”); Concord Boat, 207 F.3d at 1062 (observing that “Brunswick’s competitors also cut prices in order to attract additional business, confirming that such a practice was a normal competitive tool within the ... industry”); see also Trace X Chem., Inc. v. Canadian Indus., Ltd., 738 F.2d 261, 266 (8th Cir.1984) (“Acts which are ordinary business practices typical of those used in a competitive market do not constitute conduct violative of Section 2.”).
But appellees’ case fails for one more reason than its failure to show that Eaton engaged in anticompetitive conduct, in that their case also did not include evidence that the LTAs harmed competition. See Dentsply, 399 F.3d at 187 (“There must be proof that competition, not merely competitors, has been harmed.”). Appellees contend that the LTAs harmed competition by depriving truck buyers of access to the FreedomLine, which appellees believe was a technologically innovative product, and by causing truck buyers to pay higher prices.
*348 With regard to the FreedomLine, it is enough to say once more that the OEMs and truck purchasers were at all times free to purchase that transmission as well as any other of ZFM’s transmissions, whether or not those transmissions were listed in the data books. Additionally, with the exception of International, the LTAs permitted the OEMs to list all of ZFM’s transmissions, including the FreedomLine, in their respective data books and the OEMs continued to do just that.[45]
Appellees do not point to any evidence in support of their contention that truck purchasers paid higher prices as a result of the LTAs. The only evidence that I can find in the record relevant to appellees’ allegation in this regard is Dr. DeRamus’ statement in his expert report offered by appellees that after the LTAs went into effect Eaton reduced its “competitive equalization” or incentive payments that historically it had paid to truck buyers as an incentive to them to select Eaton’s transmissions. See J.A. at 4830. While Dr. DeRamus put forth data demonstrating that Eaton decreased its competitive equalization payments on average by about $100 (dropping from roughly $500 on average to just below $400 on average) from 1999 to 2007, see id. at 4831, he did not present a scintilla of evidence that track purchasers ultimately paid a higher price for Eaton’s transmissions during the existence of the LTAs or following their expiration. Overall, it is clear that his testimony in this regard as an inadequate basis on which to predicate an antitrust case. In sum, appellees failed to put forth any— much less sufficient — evidence that Eaton engaged in anticompetitive conduct or that Eaton’s conduct actually harmed competition, both of which are required elements of a claim under Section 2.[46]
III. CONCLUSION
I offer a few final thoughts on this important case, which, though seemingly *349 complicated, should have an obvious result. It is axiomatic that “[t]he antitrust laws ... were enacted for ‘the, protection of competition not competitors.’ ” Brunswick, 429 U.S. at 488, 97 S.Ct. at 697 (quoting Brown Shoe Co. v. United States, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)) (emphasis in original). Yet as often as this refrain is repeated throughout antitrust jurisprudence, it appears increasingly that disappointed competitors, on the assumption that their deficient performances must be attributable to their competitors’ anticompetitive conduct rather than their own errors in judgment or shortcomings or their competitors’ more desirable products or business decisions, or on the assumption that they can convince a jury of that view, turn to the antitrust laws when they have been outperformed in the marketplace. Of course, competitors can be and sometimes are harmed by their peers’ anticompetitive conduct and when they show that is what happened they may have viable antitrust claims. Yet often it is the case that a defeated competitor falls back on the antitrust laws in an attempt to achieve in the courts the goal that it could not reach in the properly-functioning competitive marketplace. This case is a classic demonstration of that process, which so far with respect to liability even if not damages has been successful. Indeed, I find it remarkable that appellees’ case that is predicated on nothing more than smoke and mirrors has gotten so far.
But the basic facts are clear. Appellees do not bring a predatory pricing claim because they cannot do so as Eaton’s prices were above cost. Instead, they seek refuge in the law of exclusive dealing to challenge the LTAs, which based on the record could not be found to be either facially or de facto exclusive or mandatory. After stripping this case of appellees’ baseless insinuations that Eaton engaged in coercive or threatening conduct in regards to the LTAs, it becomes apparent that the core of appellees’ claim really is their belief they had a superior product in the FreedomLine and the disappointing sales of that product relative to their expectations must have been attributable to Eaton’s anticompetitive conduct. See appellees’ br. at 32 (“Eaton’s conduct harmed competition and ZFM. For the first time in this market, a better product, even combined with offers of discounts, could not elicit additional sales because Eaton’s LTAs and other conduct had broken the competitive mechanism.”). Appellees thus “appear[ ] to be assuming that if [Eaton’s] product was not objectively superior, then its victories were not on the merits.” Steams Airport Equip., 170 F.3d at 527.
As the Court of Appeals for the Fifth Circuit stated in Steams Airport Equipment in confronting a similar type of claim, courts are “ill-suited ... to judge the relative merits of’ the parties’ respective products. Id. “That decision is left in the hands of the consumer, not the courts, and to the extent this judgment is ‘objectively’ wrong, the inference is not that there has been a[n] [antitrust] violation ..., but rather that the winning party displayed superior business acumen in selling its product.” Id. The truth is that neither judges nor juries have expertise in determining the best transmission to buy. Certainly, the purchasers of trucks and transmissions should make transmission decisions for themselves and so long as appellees manufactured their transmissions they had a chance to be their supplier.
I recognize that the record could support a finding that the FreedomLine was a technological innovation for which Eaton did not offer a technically comparable product, and I further recognize that Eaton engaged in vigorous competition through aggressive but above-cost meth *350 ods to compensate for the possible deficiency of their transmission offerings in that regard. But in the absence of anti-competitive conduct, the antitrust laws do not forbid Eaton’s response. See Ball Mem’l Hosp., Inc. v. Mutual Hosp. Ins., Inc., 784 F.2d 1325, 1339 (7th Cir.1986) (“Even the largest firms may engage in hard competition, knowing that this will enlarge their market shares.”) (citations omitted). In reality, however, the record compels that the conclusion that Eaton was able to maintain its dominant market position in the face of the availability of the FreedomLine for myriad reasons, including its capability of offering the OEMs a full product line, favorable pricing, its long-standing, positive reputation, and various market forces that favored an established market player such as Eaton. And it is also evident from the record, especially from ZFM’s internal documents, that there were numerous intervening factors, such as ZFM’s precipitously falling market share, which tellingly predated the adoption of the LTAs, the market’s drive towards full-product line manufacturers, the OEMs’ hesitancy to purchase new products, and the severe market downturn, that disfavored ZFM.[47] In the difficult market it faced, Meritor entered into a joint venture that needed to achieve an almost one-third market share within approximately four years of the venture’s formation to maintain a viable business, an obviously ambitious goal indeed even when one overlooks the fact that the joint venture offered a limited product line and a flagship transmission that cost far more than other transmissions in the market.
I note finally that courts’ erroneous judgments in cases such as this one do not come without a cost to the economy as a whole. Discounts of all varieties, whether tied to the purchase of multiple products, exclusivity, volume, or market-share, are ubiquitous in our society. “Discounts are the age-old way that merchants induce customers to purchase from them and not from someone else or to purchase more than they otherwise would.” Hovenkamp, Discounts and Exclusion, 2006 Utah L.Rev. at 843. Indeed, market-share discounts can be particularly pro-competitive because they can result in lower prices for a broader range of customers as they extend to smaller purchasers discounts typically reserved for the largest of purchasers under more common volume-discount programs. See IIIA Areeda & Hovenkamp, Antitrust Law f 786b2, at 148. “[Ljower prices help consumers. The competitive marketplace that the antitrust laws encourage and protect is characterized by firms willing and able to cut prices in order to take customers from their rivals.” Barry Wright Corp., 724 F.2d at 231. Accordingly, “mistaken inferences in cases such as this one are especially costly, because they chill the very conduct the antitrust laws are designed to protect.” Matsushita Elec. Indus. Co., 475 U.S. at 594, 106 S.Ct. at 1360.
*351 Thus, as the Supreme Court has stressed, courts do not issue these decisions in a vacuum: once we file our opinion in this case firms that engage in price competition but seek to stay within the confines of the antitrust laws must attempt to use the precedent that we establish as a guide for their conduct, at least if they are subject to the law of this Circuit. This is serious business indeed.[48] For this reason, the Supreme Court has “repeatedly emphasized the importance of clear rules in antitrust law.” Linkline, 555 U.S. at 452, 129 S.Ct. at 1120-21; see also Town of Concord v. Bos. Edison Co., 915 F.2d 17, 22 (1st Cir.1990) (Breyer, C.J.) (Antitrust rules “must be administratively workable and therefore cannot always take account of every complex economic circumstance or qualification.”). I confess I can glean no such clear rule from the majority’s opinion. I do not know how corporate counsel presented with a firm’s business plan at least if it is a dominant supplier that seeks to expand sales through a discount program that might be challenged by competitors as providing for a de facto exclusive dealing program and asked if the plan is lawful under the Sherman and Clayton Acts will be able to advise the management. The sad truth is that the counsel only will be able to tell management that it will have to take a chance in the courtroom casino at some then uncertain future date to find out.
If Eaton’s above-cost market-share rebate program memorialized in the LTAs, which were neither explicitly nor de facto exclusive or mandatory, can be condemned as unlawful de facto partial exclusive dealing on the basis of literally a handful of disjointed statements that amount at most to unsupported speculation as to the possibility that Eaton may have stopped supplying its transmissions if the OEMs did not meet the targets, firms face a difficult task indeed in structuring lawful discount programs. “Perhaps most troubling, firms that seek to avoid ... liability [for market-share rebate programs] will have no safe harbor for their pricing practices.” Linkline, 555 U.S. at 452, 129 S.Ct. at 1121 (citing Town of Concord, 915 F.2d at 22) (Antitrust rules “must be clear enough for lawyers to explain them to clients.”). What I find most troubling is that firms will play it safe by not formulating discount programs and that the result of this case will be an increase of prices to purchasers and the stifling of competition, surely a perverse outcome. It is ironical that the very circumstance that the majority’s opinion is so thoughtful and well crafted that the risk that it poses is so great. On the other hand, the approach I believe the Supreme Court’s precedent compels— applying and giving persuasive effect to the Brooke Group price-cost test and granting a presumption of lawfulness to pricing practices that result in above-cost prices — provides clear direction to firms engaging in price competition but still allows for an antitrust plaintiff to allege that a defendant has engaged in attendant anti-competitive conduct that renders its practices unlawful.
In sum, I conclude that Eaton was entitled to judgment as a matter of law on liability in all respects. Accordingly, I would reverse the judgment of the District Court and remand this case for entry of a judgment in favor of Eaton. My view of this facet of the case renders it unnecessary for me to consider the numerous other issues raised on this appeal, including the District Court’s decision that appellees *352 suffered antitrust injury, and its decisions regarding damages and injunctive relief. Thus, I do not opine on the proper disposition of those matters.

. “Standard” and "preferred” positioning are not the same thing. See J.A. at 2546 (PAC-CAR and Eaton's LTA) (stating that PACCAR will list Eaton’s product "as Standard Equipment and the Preferred Option," whereas “ ‘Standard Equipment' means the equipment that is provided to a customer unless the customer expressly designates another supplier’s product” and " 'Preferred Option' means the lowest priced option in the Data Book for comparable products”).

. I refer to the plaintiffs as appellees even though they are also appellants in these consolidated appeals.

. As explained below, ZFM dissolved in December of 2003, and thus Meritor was handling sales of the FreedomLine transmission in the NAFTA market as of 2004.

. International already had listed Eaton as the standard option as of 1996 because, according to an International representative, Eaton provided the greatest value to International. See J.A. at 1533.

. Eaton also entered into an LTA with the OEM Mack Trucks that same month. Volvo had acquired Mack Trucks in 2001, and it appears that the LTAs are substantively the same. Accordingly, I refer only to the Volvo LTA.

. Under the Brooke Group price-cost test, a firm must first establish that the defendant’s prices "are below an appropriate measure of its ... costs," and second, it must show that the defendant "had a reasonable prospect [under § 1 of the Sherman Act], or, under § 2 of the Sherman Act, a dangerous probability, of recouping its investment in below-cost prices.” 509 U.S. at 223-24, 113 S.Ct. at 2587-88.

. Apart from meeting the requirements of Article III standing, an antitrust plaintiff seeking monetary or injunctive relief must show that it has suffered antitnASt injury, i.e., an “injury of the type that the antitrust laws were intended to prevent and that flows from that which makes [the] defendant's] acts unlawful.” Brunswick Corp. v. Pueblo Bowl-O-Mat Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). Although courts often conflate the antitrust injury requirement with die determination of whether the defendant’s conduct violated the antitrust laws, this approach is erroneous as the antitrust injury requirement assumes the defendant's conduct was unlawful (and thus anticompetitive) and asks whether the anticompetitive aspect of the unlawful conduct is the cause of plaintiff’s injury. See Angelico v. Lehigh Valley Hosp., Inc., 184 F.3d 268, 275 n. 2 (3d Cir.1999) ("The District Court erred by incorporating the issue of anticompetitive market effect into its standing analysis, confusing antitrust injury with an element of a claim under section 1 of the Sherman Act ....”); see also Daniel v. Am. Bd. of Emergency Med., 428 F.3d 408, 447-48 (2d Cir.2005) (explaining that anti-competitive effects of defendant’s behavior “are classic 'rule of reason’ questions, distinct from the antitrust standing question") (citations omitted). Because I conclude that Eaton was entitled to judgment as a matter of law as there was insufficient evidence for the jury's conclusion that Eaton violated Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act, I do not address whether appellees satisfied the antitrust injury requirement. Accord L.A.P.D., Inc. v. Gen. Elec. Corp., 132 F.3d 402, 404 (7th Cir.1997) ("Because LAPD adequately alleges injury in fact and thus has standing under Article III, however, we may bypass the antitrust-injuiy issue to go straight to the merits.”); Hairston v. Pac. 10 Conference, 101 F.3d 1315, 1318 (9th Cir.1996) ("[W]e need not decide whether appellants have met the requirements for antitrust standing, because they have failed to establish any violation of the antitrust laws.”); Levine v. Cent. Fl. Med. Affiliates, Inc., 72 F.3d 1538, 1545 (11th Cir.1996) ("We need not decide whether Dr. Levine has met the requirements for standing as to any of his antitrust claims, because as to each one he has failed to establish any violation of the antitrust laws.”).

. A firm engages in "predatory pricing” when it cuts its prices below an appropriate measure of cost to force competitors out of the market or to deter potential entrants from entering the market. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 584 n. 8, 106 S.Ct. 1348, 1355 n. 8, 89 L.Ed.2d 538 (1986). "The success of any predatory scheme depends on maintaining monopoly power for long enough both to recoup the predator’s losses and to harvest some additional gain.” Id. at 589, 106 S.Ct. at 1357 (emphasis in original). Due to the inherently speculative nature of such an undertaking, "predatory pricing schemes are rarely tried, and even more rarely successful.” Id.

. As the leading antitrust treatise points out, "to be challenged as unlawful exclusive dealing, ... [a] quantity discount program would necessarily involve prices above cost, else the program would not be sustainable.” Phillip E. Areeda & Herbert Hovenkamp, Fundamentals of Antitrust Law § 18.03b, at 18-70 (4th ed. 2011).

. Throughout this opinion I use the term "pricing practices” to encompass the variety of ways in which a firm may set its prices, including but not limited to, straightforward price cuts and conditional rebates or discounts.

. I recognize that the majority states that Eaton’s low prices are not irrelevant to the extent they may help explain why the OEMs entered the LTAs even though the LTAs allegedly included terms that were unfavorable to the OEMs and to rebut an argument that the agreements were inefficient but the majority does not factor the circumstance that Eaton’s prices were above cost into its analysis of whether the LTAs were exclusionary and anti-competitive, and I believe its failure to do so is error.

. I cannot utilize this phrase without making the point that where a court permits a nonexclusive, non-mandatory supply agreement to morph into a mandatory exclusive-dealing contract to legitimize a plaintiff's claim of unlawful "de facto partial exclusive dealing” the court follows antitrust plaintiffs down the rabbit hole a bit too far. While "de facto partial exclusive dealing” is a creative neologism, the phrase not only distorts the English language (in what other realm would one refer to a contract as "partially exclusive”?), it takes us so far from the text of Section 3 of the Clayton Act and the actual concept of exclusive dealing that I shudder to think what will be labeled as exclusive dealing next.
The majority concedes that “partial exclusive dealing is rarely a valid antitrust theory. ” Op. at 283 (internal quotation marks omitted). Indeed, the only thing rarer may be what appellees actually allege here: "de facto partial exclusive dealing.” I am not aware of any Supreme Court or court of appeals precedent recognizing such a claim, and a Westlaw search of the phrase reveals only one other case recognizing the concept as a viable antitrust claim. In a sign that we truly have come full circle, that case is a class action pending in the United States District Court for the District of Delaware brought by truck purchasers against Eaton, the four OEMs, and a handful of other entities, alleging that the same LTAs at issue here violated Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act. See Wallach v. Eaton Corp., 814 F.Supp.2d 428, 442-43 (D.Del.2011).

. As did Cargill, Brunswick Corp. involved a competitor’s antitrust challenge to an allegedly illegal acquisition under Section 7 of the Clayton Act because it would have brought a " 'deep pocket’ parent into a market of 'pygmies.' ” 429 U.S. at 487, 97 S.Ct. at 697. The Court concluded that the plaintiff could not show antitrust injury based on the losses it would suffer from that acquisition because the aspect of the merger that made it unlawful did not cause the plaintiff’s losses. See id.
The majority interprets the Supreme Court’s statement it had adhered to the principle that "in the context of pricing practices only predatory pricing has the requisite anti-competitive effect” “regardless of the type of antitrust claim involved” to mean “that the price-cost test applies regardless of the statute under which a pricing practice claim is brought, not that the price-cost [test] applies regardless of the type of anticompetitive conduct.” Op. at 280 n. 13. While the Supreme Court’s statement undoubtedly makes clear that the principle that above-cost pricing is not anticompetitive applies regardless of which provision of the antitrust laws is at issue, I believe that the Court's rather clear statement that it had adhered to this principle "regardless of the type of antitrust claim involved ” means exactly what it says — that *315 whether the plaintiff challenges a defendant's pricing practices in the context of a challenge to an allegedly unlawful merger or whether it does so in the context of a claim that a defendant has entered a price-fixing agreement a plaintiff cannot contend that the prices resulting from those arrangements are anticompetitive unless they are below cost. While I do not believe that the Court’s statement in this regard requires that the price-cost test apply with dispositive force in every challenge to a defendant’s pricing practices because there may be other elements of a defendant's conduct that are anticompetitive notwithstanding its above-cost prices, the Court’s reasoning undoubtedly lends support to my conclusion that the price-cost test must factor into a court's decision when it is asked to judge the lawfulness of such a defendant's rebate program.

. An equally important facet of the Court’s decision in Linkline, in a context quite apart from that here, was its holding that a plaintiff may not bring a Section 2 Sherman Act price-squeeze claim "when the defendant is under no antitrust obligation to sell the inputs to the plaintiff in the first place.” 555 U.S. at 442, 129 S.Ct. at 1115.

. As noted, in the case of PACCAR’s and International’s respective LTAs, Eaton provided up-front cash payments in addition to market rebates. Although these payments were not in the form of rebates, they cannot be distinguished from the market-share rebates because both practices were an avenue for Eaton ultimately to provide discounted prices to the OEMs. Accord Race Tires Am., Inc. v. Hoosier Racing Tire Corp., 614 F.3d 57, 79 (3d Cir.2010) (noting that tire manufacturer's offer of up-front payments to race sanctioning bodies to select manufacturer's tires presented no more a coercive threat than an offer of lower prices); NicSand, Inc. v. 3M Co., 507 F.3d 442, 452 (6th Cir.2007) (en banc) (noting that defendant’s cash payments to induce retailers to carry its product solely were “nothing more than price reductions offered to the buyers”) (internal quotation marks and citation omitted).

. Likewise, I concur fully with the majority's point that a firm may engage in anticompetitive conduct without engaging in below-cost pricing. The antitrust laws proscribe an array of conduct that, of course, does not require as an essential element below-cost pricing. For example, tying arrangements, unlawful mergers, and price-fixing agreements, *319 to name a few, are all practices that may violate the antitrust laws regardless of the prices resulting from such conduct. The Supreme Court has made clear, however, that where an antitrust plaintiff attacks a defendant's pricing practices, i.e. price cuts, rebates or the like, if those practices result in above-cost prices they generally do not threaten competition, regardless of the source or type of antitrust claim at issue.

. Appellees rely heavily on LePage’s Inc. v. 3M, 324 F.3d 141 (3d Cir.2003) (en banc), and contend that our decision in that case precludes the possibility that the price-cost test has any applicability outside of the predatory-pricing-claim framework. For essentially the same reasons the majority sets forth, I, too, believe that LePage's must be confined to its facts and in any event does not bear on the present factually-distinguishable case.
LePage’s dealt with bundled rebates, a practice which we analogized to tying arrangements in its exclusive potential and which we concluded may exclude an equally efficient but less diversified rival even if the bundled rebates resulted in above-cost prices. See 324 F.3d at 155 ("The principal anticompetitive effect of bundled rebates as offered by 3M is that when offered by a monopolist they may foreclose portions of the market to a potential competitor who does not manufacture an equally diverse group of products and who therefore cannot make a comparable offer.”). Above-cost single-product market-share discounts, however, do not present the same putative danger of excluding an equally efficient but less diversified rival by virtue of that rival's limited production alone. For this exact reason, as I explain in further detail below, the same leading antitrust treatise upon which LePage's relied to analogize bundled rebates to tying concludes that single-product market-share discounts are more appropriately likened to straightforward price cuts and the Brooke Group rice-cost test should control challenges to such programs. Thus, I concur with the majority that our reasoning in that case necessarily is limited to a single-product producer’s claim that it has been excluded through a more-diversified competitor’s bundled rebate program that conditioned discounts on the purchase of products that the single-product producer did not offer.
Additionally, while I believe that LePage’s ’ bases for distinguishing Brooke Group stood on questionable grounds when we set them forth nine years ago, as the majority notes the Supreme Court's subsequent decisions have eviscerated those bases and counsel that we do not extend LePage’s beyond its original parameters. Furthermore, in concluding that LePage’s must be confined to its facts, I think it appropriate to point out that there has been considerable academic criticism of our opinion in that case. See, e.g., J. Shahar Billbary, Predatory Bundling and the Exclusionary Standard, 67 Wash. & Lee L.Rev. 1231, 1246 (Fall 2010) ("[T]he main problem with the LePage’s test is that it does not investigate whether a bundled discount is pro-competitive .... [It] may in fact protect a less efficient competitor (as LePage's admitted to be.”)); Richard A. Epstein, Monopoly Dominance or Level Playing Field? The New Antitrust Paradox, 72 U. Chi. L.Rev. 49, 49, 61-72 (Winter 2005) (criticizing LePage’s ’ reasoning and noting that the case "shows the deleterious consequences that flow from the aggressive condemnation of unilateral practices”). Moreover, another court of appeals specifically has declined to follow LePage’s, see Cascade Health Solutions, 515 F.3d at 903. But perhaps most significantly, the Antitrust Modernization Commission, a statutorily-created bipartisan group tasked with evaluating the state of antitrust law and setting forth recommendations to Congress and the President for its modernization, criticized LePage’s as potentially "harmfing] consumer welfare,” and proposed instead that courts adopt a three-part test modeled after Brooke Group’s below-cost pricing test to evaluate the lawfulness of bundled discounts. See Antitrust Modernization Comm’n, Report and Recommendations 94-99 (2007) available at http://govinfo. *320 Hbrary.unt.edu/amc/reporLrecommendation/ ame JfinaL report.pdf

. In this regard I note that Eaton’s rebate program existed in the same form, above-cost prices and all, on the day before appellees filed their claim as on the day after they filed their claim. The program did not undergo an ontological transformation because appellees had enough prudence not to challenge the price aspects of the program.

. Of course, the majority in effect if not intent encourages an antitrust plaintiff challenging a defendant’s above-cost pricing practices simply to avoid any mention of defendant's prices. In light of the majority’s approach, it would be the rare case indeed in which a sophisticated plaintiff would bring an exclusive dealing claim against a defendant's above-cost pricing practices and allege that price itself functioned as the exclusion *322 ary tool for such a claim necessarily would be ill-fated under the majority’s approach.

. The majority quotes from Areeda and Hovenkamp to explain the treatise’s perspective that a dominant firm may employ exclusive-dealing contracts to preclude a young rival’s expansion. I do not doubt the truth of this statement but as I note above the treatise takes the position that market-share discount programs that do not condition the discount on exclusivity, which precisely describes Eaton's program, are, in fact, not exclusive dealing contracts and should not be treated as such. Areeda and Hovenkamp suggest that where a market-share discount program conditions the discount on exclusivity the standards applicable to exclusive dealing should apply. See Fundamentals of Antitrust Law, § 18.03b, at 18-65 (“A discount conditioned on exclusivity should generally be treated as no different than an orthodox exclusive-dealing arrangement.”).

22. Of course, [¶] truck transmissions are not fungible products. Indeed, this fact is an unstated premise of appellees' claims because they contend essentially that the FreedomLine was far superior to Eaton’s transmissions and that its failure in the marketplace can be attributed only to Eaton’s anticompetitive conduct.

. As I explain below, Areeda and Hovenkamp take the position that Section 3 does not encompass non-exclusive market-share discount programs.

. The majority collapses appellees’ three claims into one analysis, and while that approach is not necessarily incorrect and the three provisions at issue overlap substantially, I believe it most prudent to address the claims separately as the provisions at issue have some distinct elements that require separate discussion.
In this case, I make many more citations to the record than judges of this Court ordinarily would make in an opinion. I do so because while deference to the jury's verdict requires that we not reweigh the evidence and that we view the evidence in the light most favorable to appellees, where, as here, the evidence supporting that verdict falls so short of the standard required to sustain that verdict I believe it appropriate to point not only to the absence of evidence supporting the jury verdict but also to the considerable undisputed evidence contradicting that verdict.

. In Tampa Electric, the Court indicated that if an arrangement is lawful under Section 3 of the Clayton Act it will be lawful under both Sections 1 and 2 of the Sherman Act. See 365 U.S. at 335, 81 S.Ct. at 632 ("We need not discuss the respondents' further contention that the contract also violates § 1 and § 2 of the Sherman Act, for if it does not fall within the broader proscription of § 3 of the Clayton Act it follows that it is not forbidden by those of the former.”) (citing Times-Picayune Publ’g Co. v. United States, 345 U.S. 594, 608-09, 73 S.Ct. 872, 880, 97 L.Ed. 1277 (1953)). In Barr Laboratories, however, we disposed of *326 the plaintiff's Section 1 Sherman Act claim with its Section 3 Clayton Act claim but we addressed the plaintiff’s Section 2 Sherman Act claim separately. See 978 F.2d at 110-12; see also Dentsply, 399 F.3d at 197 (concluding that the district court erred in stating that defendant had not violated Section 2 of the Sherman Act solely because it had concluded that defendant had not violated Section 3 of the Clayton Act) (citing LePage’s, 324 F.3d at 157 n. 10). For this reason, I subsume appellees’ Section 1 Sherman Act claim within its Section 3 claim but I address separately appellees' Section 2 Sherman Act claim.

. In substance, the Tampa Electric standard for Clayton Act Section 3 claims differs very marginally, if at all, from the fact-intensive rule-of-reason analysis that applies to this case under Section 1 of the Sherman Act. Cf. Deutscher Tennis Bund v. ATP Tour, Inc., 610 F.3d 820, 830 (3d Cir.2010) ("The rule of reason requires the fact-finder to weigh [ ] all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition. The inquiry is whether the restraint at issue is one that promotes competition or one that suppresses competition.”) (quotation marks and citations omitted). Indeed, it appears more often than not that in a Section 1 case courts explicitly employ the Tampa Electric standard as the guiding framework for the rule-of-reason analysis. See, e.g. Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp., 592 F.3d 991, 996 (9th Cir.2010) ("Under the antitrust rule of reason, an exclusive dealing arrangement violates Section 1 only if its effect is to 'foreclose competition in a substantial share of the line of commerce affected.’ ”) (quoting Omega Envtl., 127 F.3d at 1162); see also Jefferson Parish, 466 U.S. at 45, 104 S.Ct. at 1575 *328 (O’Connor, J., concurring) ("Exclusive dealing arrangements are independently subject to scrutiny under § 1 of the Sherman Act, and are also analyzed under the Rule of Reason.”) (citing Tampa Elec. Co., 365 U.S. at 333-35, 81 S.Ct. at 631-32).

. Section 1 of the Sherman Act, which proscribes "[ejvery contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce,” 15 U.S.C. § 1 and Section 2 of the Sherman Act, which proscribes the monopolization or attempted monopolization of trade or commerce, 15 U.S.C. § 2, do not contain Section 3’s "on the condition” language. Accordingly, the LTAs fall within the theoretical reach of those provisions. Nevertheless, appellees' Section 1 and 2 claims fail because appellees did not introduce sufficient evidence from which a jury could infer that the LTAs were exclusive dealing contracts that foreclosed competition in the marketplace.

. In fact, even if the LTAs had required the OEMs to purchase a certain share but not all of their transmissions needs from Eaton, as the majority interprets them to do, it is still unclear whether Section 3 would have reached that agreement. See Areeda & Hovenkamp, Fundamentals of Antitrust Law § 18.01c, at 18-17 ("Literally, a ‘partial’ ex- *329 elusive dealing requirement appears not to be covered by § 3 of the Clayton Act at all. For example, if A requires B to purchase 'at least 60 percent’ of its gasoline needs from A, B is still free to purchase the remaining 40 percent elsewhere. As a result, there is no condition that B not deal in the goods of a competitor, as the statute requires. Most of the courts take this position.”) (citations omitted).

. In Tampa Electric, the case most often cited for the "practical effect" standard, the Court considered a challenge to a requirements contract and "assume[d], but d[id] not decide, that the contract [wa]s an exclusive-dealing arrangement within the compass of § 3.” 365 U.S. at 330, 81 S.Ct. at 629.

. LePage’s and Dentsply, cases on which the majority relies, are not to the contrary. Those cases dealt not with Section 3 of the Clayton Act but rather with Section 2 of the Sherman Act, which does not contain the same restrictive "on the condition” language as Section 3. Furthermore, in LePage’s, we concluded that 3M's bundled rebate agreements constituted unlawful de facto exclusive dealing arrangements because LePage’s "introduced powerful evidence” that its prior customers refused to meet with LePage’s’ sales representatives, refused to discuss purchasing LePage’s products for “the next three years,” and 3M offered bonus rebates to its customers upon achieving sole-supplier status. 324 F.3d at 158. And in Dentsply, we concluded that a provision that Dentsply imposed on its dealers that actually prohibited the dealers from adding its competitors’ tooth lines as part of their product offering amounted to exclusive dealing. 399 F.3d at 193. Here, as explained below, appellees fell woefully short of introducing evidence that the LTAs induced anything approaching actual exclusivity.

. See, e.g., Barry Wright Corp., 724 F.2d at 229, 237 (observing that potential foreclosure effect of volume discount requirements contract between manufacturer, who had 83% to 94% market share, and purchaser of mechanical snubbers was 50% where purchaser's snubber purchases represented 50% of snubber market). The distinction between these two inquiries, the question of Eaton's market share and the question of the LTAs' alleged foreclosure effect, is particularly critical in a case such as this one since prior to 1989 Eaton was the only [¶] transmission manufacturer and thus possessed 100% market share at a time before appellees contend that it engaged in any alleged anticompetitive conduct.

. Although Dr. DeRamus did not set forth explicitly in his expert report how he arrived at his foreclosure percentage or his arithmetic in that regard — a shocking oversight in a case that hinges on this very question — his testimony at trial illuminates that he relied on the market-share targets to arrive at his estimation of the LTAs’ foreclosure effect, though notably he testified as to a different foreclosure percentage than that which he set forth in his report. See LA. at 858 (Dr. DeRamus’ testimony) (explaining that he arrived at his opinion of the LTAs’ foreclosure effect by rely *332 ing on the market-share targets and opining that one could take a "simple average” of the market-share targets to yield a 90% foreclosure rate).

.The District Court’s statement in this regard was inaccurate as Volvo’s LTA granted it rebates beginning at a 65% market-share target.

. The court also found significant the plaintiffs’ expert failure to explain why "price-sensitive hospitals would adhere to Tyco's market-share agreements when they could purchase less expensive generic sensors instead.” 592 F.3d at 997.

. The plaintiffs also alleged that Brunswick had violated Section 7 of the Clayton Act and Section 2 of the Sherman Act, but the court *333 likewise rejected these claims. See 207 F.3d at 1043, 1053, 1062.

. The majority states, without elaboration, that Eaton assured that there would be no other supplier that could fulfill the OEMs’ needs or offer a lower price. I note first that it is an undisputed fact that when Meritor entered into the joint venture with ZF AG at a time prior to any allegation of anticompetitive conduct by Eaton, Meritor did not offer a full product line of [¶] truck transmissions. Thereafter, ZFM explicitly identified its lack of a full product line as a barrier to its market success and yet it did not develop a full product line. There is no evidence that Eaton somehow prevented either Meritor or later ZFM from developing a full product line. Furthermore, there is no evidence in the rec *335 ord indicating that Eaton prevented ZFM from offering more attractive discounts to capture Eaton's business and there is no evidence that other firms tried to enter the [¶] truck transmission market but were thwarted by Eaton.

. I recognize that appellees contend that "[fjar from offering low prices to seek competitive advantages ... Eaton broke the price mechanism, so that ZFM could not compete even by offering discounts or other incentives notwithstanding that ZFM had a better product.” Appellees’ br. at 44. But appellees' assessment of their product does not establish that the truck purchasers — the entities that actually made the ultimate decision as to which transmission to select for their trucks— would make the same assessment. Indeed, some of the evidence suggests that both OEMs and truck purchasers held the opinion that overall Meritor’s products were inferior to Eaton’s, and Meritor does not point to evidence foreclosing the possibility that its relatively unfavorable reputation in that regard persisted despite the emergence of ZF Meritor and thereby tainted truck purchasers' view of the FreedomLine. Moreover, even if the truck purchasers had come to the same conclusion as appellees regarding the Freedom-Line’s technical superiority, appellees’ complaint holds no force as the purchasers’ were at all times free to act on that opinion by selecting the FreedomLine for their trucks. Nevertheless, it is clear from the record that other factors beyond possible technical superiority, including such considerations as price, service, and availability of the product, could motivate a purchaser in making its decision as to the most advantageous transmission for it to purchase. Lest this fact be doubted I merely need to point out that consumers regularly purchase inexpensive automobiles even though more highly-priced automobiles might be technically better. Overall, the point remains that if ZFM was an equally efficient competitor the LTAs simply did not preclude it from competing with Eaton and did not foreclose competition in any portion of the market, and thus a jury verdict based on a contrary conclusion simply could not survive Eaton’s motion for judgment as a matter of law.

. The majority appears to 'hang its hat to some extent on the notion that even if the OEMs did not actually face the threat of losing Eaton as a supplier they believed they might and that belief drove their compliance with the LTAs. While, as noted, there is scant evidence, indeed, for the proposition that the OEMs’ efforts to meet the market-share targets was driven by such a belief, thát belief, if unfounded as it was here, does not support the majority’s repeated statements to the effect that Eaton actually coerced the OEMs into entering the LTAs and meeting the targets.

. Appellees contend that the OEMs did not want to enter the LTAs and did so only in response to Eaton's coercion by citing to testimony that in fact weakens their case. In this regard, appellees rely on a Volvo representative's testimony that it entered into the LTA with Eaton because ZFM did not have a full product line and thus Volvo would require Eaton’s products even if it entered into an LTA with ZFM but if Eaton was not its standard partner it would not provide favorable *338 pricing to Volvo. See J.A. at 522; see also J.A. 2098 (noting that Eaton would not provide favorable pricing to Volvo if it selected ZFM as its partner). In part for this reason, it elected to enter the LTA with Eaton.
In business as in life we rarely are presented with a perfect option. The fact that long-term supply agreements with ZFM and Eaton each had their respective advantages and disadvantages is hardly surprising and that Eaton would not have granted an OEM the generous discounts its LTA provided if it selected ZFM as its primary supplier is likewise not exactly an astonishing revelation. That the OEMs had to weigh these factors in deciding whether to enter into an LTA with Eaton hardly amounts to coercion.

. In their brief, appellees point to the testimony of two OEM representatives who testified to the hardly surprising fact that they would have preferred upfront price cuts with no strings attached as opposed to conditional market-share targets but that the OEMs entered the agreements because they nonetheless offered the best prices. See J.A. at 415-16 (deposition testimony of International representative) (stating that International preferred to have upfront discounts "in price” but "if a supplier is willing to offer [it] rebates” it would take that option if it believed it could meet the conditions for those rebates); see id. at 525 (deposition testimony of Volvo representative) (stating that during LTA negotiations Volvo "wanted no” market-share targets but it agreed to the 68% target because it believed it could achieve that target and it "wanted the savings and the equalization, and the rebates"). That the OEMs would have preferred that Eaton simply cut its prices is hardly surprising. Customers faced with a buy one at full price and get one for 50% off deal likely would prefer to have the option of buying one item for 50% off. Yet, in the same way that the customer who purchases the two items to receive the discount on one cannot be said to have been "coerced” into that transaction, the OEMs' preference for unconditional price cuts hardly can be used as evidence that the terms of the LTAs were "unfavorable” to them, much less so “unfavorable” as to warrant the inference that the OEMs must have entered them as a product of coercion.

. Of course, the lack of coercion associated with the LTAs is significant. While coercion is not "an essential element of every antitrust claim,” it is an important consideration where the relevant market players adopt their own business practices and the parties "freely entered into exclusive contracts.” Race Tires, 614 F.3d at 78.

. Although I conclude that the LTAs did not foreclose competition in any portion of the market, if as the majority concludes, the LTAs did foreclose competition in the market, that alleged foreclosure effect necessarily was diminished by the fact that the LTAs at most blocked only one avenue of reaching the end-users, i.e., the truck purchasers. Component part manufacturers, including ZFM, can and do advertise directly to truck purchasers and are able to offer discounts directly to those consumers as an incentive for them to select their parts from their data books, and truck purchasers were at all times free to select appellees' products.

. The majority states that the procompetitive justifications of the LTAs are diminished by the fact that no OEM asked Eaton to be a sole supplier. My response to that assertion is as simple as remarking once more that the LTAs did not by their terms or by their effect make Eaton a sole supplier for any of the OEMs.

. Thus, as the majority notes, in an email exchange between Eaton and Freightliner representatives a Freightliner representative stated that its LTA with Eaton required it to price ZFM's products at a $200 premium. Yet, Freightliner’s LTA did not require that Freightliner price ZFM’s products at a premium; it simply required that Eaton's products be the lowest-priced option. In light of the silence of Freightliner’s LTA as to this issue, I can interpret this exchange only to mean that Freightliner had elected to price Eaton’s products preferentially by imposing the $200 premium on ZFM’s products. Likewise, it appears that International and PACCAR may have imposed charges on customers who selected ZFM's products but neither their respective LTA nor Eaton itself required them to do so. In fact, as noted, at least in regard to International, there is evidence in the record that suggests that the data book price increases for ZFM’s transmissions were a product of International’s realization in 2002 that its current price for ZFM's products did not reflect accurately the cost of that product to International. See J.A. at 3727 (e-mail from Paul D. Barkus, International, to Galynn Skelnik, International (Jan. 11, 2002)) (proposing that International increase ZFM’s list prices to bring them "in line with where they should be”).

. I have not overlooked the fact that International's LTA required it to list Eaton's transmissions exclusively. Yet, International continued to list ZFM’s manual transmissions, and it is thus not apparent whether its decision not to list ZFM’s automated and automated mechanical transmissions is attributable to the LTA. Regardless, International’s failure to list the FreedomLine, standing alone, did not deprive truck purchasers of access to the FreedomLine because truck purchasers were at all times free to specify the use of the FreedomLine transmission. Furthermore, it is important to note that [¶] truck purchasers in many cases were sophisticated customers in the [¶] truck market that were aware that ZFM's transmissions were available. Though I recognize that some purchasers likely were small operators perhaps owning only one [¶] truck who may have had limited knowledge of the differences in available transmissions, certainly the large purchasers, i.e., big trucking companies, would have been more knowledgeable with respect to available transmissions. In any event, we are, after all, not dealing with consumers buying motor vehicles for their personal use. The transmissions involved here were installed in vehicles intended for commercial use, and the owners did not acquire the vehicles to go to the grocery store.

. Even if a plaintiff establishes under Section 2 that "monopoly power exists” and that "the exclusionary conduct ... ha[s] an anti-competitive effect,” "the monopolist still retains a defense of business justification.” Dentsply, 399 F.3d at 187; Concord Boat, 207 F.3d at 1062 (“A Section 2 defendant’s proffered business justification is the most important factor in determining whether its challenged conduct is not competition on the merits.”); Steams Airport Equip. Co., 170 F.3d at 522 ("The key factor courts have analyzed in order to determine whether challenged conduct is or is not competition on the merits is the proffered business justification for the act.”). As with appellees’ Section 3 and Section 1 claim, Eaton's valid business justifications for the LTAs undermines the notion that the LTAs constituted competition on some basis other than the merits in violation of Section 2.

. I recognize that as the majority points out, certain OEM representatives speculated that the LTAs damaged significantly ZFM's business and may have caused its ultimate demise. As I have stated above, it is beyond peradventure to say that ”[t]he antitrust laws ... were enacted for ‘the protection of competition not competitors.' " Brunswick, 429 U.S. at 488, 97 S.Ct. at 697 (internal quotation marks and citation omitted); see also Virgin Atl. Airways, 257 F.3d at 259 (“[Wjhat the antitrust laws are designed to protect is competitive conduct, not individual competitors.”). Even if the LTAs negatively affected ZFM’s business, that circumstance is not the salient inquiry in an antitrust case. The pivotal question is whether the LTAs negatively affected competition — not a particular competitor — in the marketplace, and for the reasons I have recited above, they could not be found to have done that.

. Of course, every decision we make is serious business and I do not imply otherwise. However, particularly in light of the current economic climax, the reasoning of a precedential opinion with such obvious economic repercussions is crucial.